# STATE EX REL. CLARYCE ELAINE NELSON, AS MOTHER AND NATURAL GUARDIAN OF PHILIP JOHN NELSON, A MINOR, v. BYRON C. WHALEY AND ANOTHER.[1]

March 16, 1956.

No. 36,690.

[1]Reported in 75 N. W. (2d) 786.

*McCabe, Clure, VanEvera & Donovan* and *Dennis F. Donovan, Jr.,* for appellant.

*Reavill, Jenswold, Neimeyer & Johnson* and *John D. Jenswold,* for respondents.

MURPHY, JUSTICE.

This is a habeas corpus proceeding for the custody of an infant. The relator is Claryce Elaine Nelson, an unmarried mother, and the respondents are Byron C. Whaley and his wife, Simone, residents of Duluth, Minnesota, who now have custody of the child. Although the trial is de novo in this court[2] we have, pursuant to stipulation of the parties, considered the case on the record below.

Because of the unusual circumstances under which the respondents acquired custody of the child, the facts giving rise to the transfer of custody of the child and the background of the parties will be set forth at some length.

The mother, Claryce Elaine Nelson, is 25 years of age. She has two children by an early marriage, a girl six and a boy 4½ years of age at the time of the hearing. She was one of eight children. Her father, a railroad employee crippled as the result of an accident, died when she was eight years of age. When she was eleven, her mother died. The record indicates there were domestic difficulties in the home of a married sister, where she lived for a time. She attended school until the second year of high school. In grade school the relator made the honor roll, but her marks fell in high school

[2] M. S. A. 589.30.

because of excessive absence. The relator gives this reason for the absence: "It seems foolish now. I didn't have any decent clothes." When she was 16 years of age, she began work as a telephone operator; when she was 18 years of age, she married. As the issue of this marriage there are two children who are with her now. She was pregnant at the time of this marriage. Her husband was addicted to the use of liquor, as a result of which they were divorced on January 24, 1952. She has had difficulty in collecting alimony, and on at least two occasions her husband has been cited for contempt growing out of his failure to pay. While the divorce was pending, she returned to work as a telephone operator. About three months after the divorce her husband promised to reform and remarriage was discussed. When he came to talk to her about it, "he brought a pint of whiskey and was going to drink that so I thought he didn't want to get married or come back, * * *." She testified this caused her to become despondent and she cut her wrists with a razor blade. She said, "I didn't cut very deep, just scratched." A few days later she went to see a doctor and told him she was depressed and "I just cried all the time and was so unhappy, * * *." She was confined to a hospital for a period of 23 days, the first part of which was in a psychiatric ward. At that time her weight dropped from 130 pounds to 106 pounds.

After she had become pregnant with the child who is the subject of these proceedings and had learned that the father would not marry her, she again became despondent and drank ammonia in the presence of a friend and a niece. This conduct was prompted "Because I wanted to hurt the baby's father and make him—I thought that—well, I just wanted affection, that was the whole part of it. We had lost everything when our home burned down and I was worried about it and I was unhappy." While she has not divulged the name of the father, she testified that she had given that information to the Welfare Department. The foregoing facts were brought out by a searching cross-examination conducted by attorneys for the respondents.

The relator is in good health at the present time. Prior to the trial, she had been examined by a psychiatrist who had an opportunity to discuss her case with the physicians who had previously attended her and had the benefit of her medical background. He gave as his opinion that at the present time she is physically and emotionally qualified to take care of her children and that no abnormal emotional condition exists. His examination and interview were conducted from the standpoint of her emotional reactions, her interests, and mental stability.

She testified that in September of 1954 she was pregnant and went to see a doctor approximately two weeks before the date of her confinement. One of the respondents, Mrs. Whaley, was a patient of this doctor. A short time before, he had performed a hysterectomy upon Mrs. Whaley as a result of which she was unable to have children. The respondents were social friends of the doctor as well. They desired to adopt a baby, and the doctor undertook to find one for them. When Mrs. Nelson consulted this doctor, he immediately recognized in her situation an opportunity to secure a baby for the Whaleys. He told Mrs. Nelson she should stay away from the Welfare Department. It appears she was afraid that the disgrace of her pregnancy would result in the loss of the custody of her two older children. There was some evidence that she was likewise apprehensive of what her divorced husband's mother might do in the event she learned of her condition. She testified the doctor told her it would be better if she gave up the baby and he told her to call the next day and he would tell her what attorney to contact. She testified: "I was worried about everything but I was more scared about my kids." On examination, the doctor testified that his interest was to work out a reciprocal problem between two patients, and on examination by the court as to his conversation with the mother, the doctor testified: "I simply made her aware of the fact that if she went out of the Welfare procedure, which she had apparently been informed about, that she might arouse the ire of the Welfare people and they might take away her two children." He testified the Whaleys were anxious to adopt a child and also

he "felt * * * certain responsibility * * * to find someone whom I thought would be suitable parents for this adoption, and having known the Whaleys and the type of people they are, I called them."

Thereafter, the Whaleys hired attorneys who contacted the mother and went to her home with two agreements for her signature. One of the agreements recited the fact that the mother was about to have a child born out of wedlock and that as soon as the child was born she would deliver it to the prospective adoptive parents who agreed to pay for prenatal care, hospitalization, and medical services attendant upon the child's birth. Under the terms of the agreement the prospective parents reserved the right to return the child or deliver it to some other placement agency for adoption. By a second agreement the relator consented to adoption by the respondents. The names of the prospective parents were not disclosed to her. She testified that at the time she signed these agreements she did it to keep her two children. She testified: "I always thought doctors were supposed to help a patient with their troubles and figure out a way, and I thought if there was a way to keep my baby and the other children, he would tell me about it. He terrified me. I was sure that I would lose my baby and my two kids and I thought I had to give my baby up."

She went to the hospital at 6 p. m. on September 28 and the child was born at about 1 a. m. on September 29. About 2 a. m., the doctor called the respondents' attorneys to tell them the child had been born and arrangements should be made to get it. She awoke at about 5 a. m. and testified that while still in the delivery room she talked to the doctor and "he bawled me out because I had told the interne that I was giving the baby up."

That next morning at about 10 a. m., one of the respondents' attorneys called at the hospital and advised Mrs. Nelson of arrangements which would be made to take over the child. The same morning a representative of the Welfare Department of St. Louis County, Mr. David Carlbom, called on her. His office had been advised of the proposed transfer of the baby, apparently by the attorneys for the Whaleys. Mr. Carlbom counseled Mrs. Nelson against parting

with the child at that time. She had had some sedatives and was weak but was conscious of what was happening. There was some evidence that she told Mr. Carlbom she felt obligated to go through with her agreement.

The next morning she was discharged from the hospital after being in confinement one day. She testified her previous confinements were from four to five days. The nurse brought the baby to her at the elevator and rode down with her to the lobby where she met one of the attorneys for the Whaleys. He had a cab waiting which they entered and were driven to the Fifth Street entrance of the Holland Hotel where they went to a suite on the seventh floor. She laid the baby on a bed or sofa and gave the attorney the feeding formula which had been furnished to her at the hospital. She was then given $5 for cab fare and told to keep the change. She returned to the waiting cab and went home to her two other children. The attorney then called the Whaleys who came to the hotel and took custody of the child.

After Mrs. Nelson returned home, she testified she called Mr. Carlbom at the Welfare office but was told he was out of town. When he returned, a few days later, she got in touch with him and advised him that she wanted to get the baby back. In the meantime, she had inquired of the doctor by telephone as to where the child was and he told her that was a confidential matter. His records do not indicate that she returned to him for post natal care. Through the Legal Aid Organization in Duluth she secured the services of an attorney who assisted in helping her locate the child. When the respondents learned of the relator's desire to secure custody of the child, their attorneys instituted proceedings in probate court as a result of which the Whaleys were appointed special guardians of the child.

The testimony of Mr. Carlbom was that he had visited the home of Mrs. Nelson and had found the home adequate, with no evidence that Mrs. Nelson had neglected her children. He stated that, while the home was not ideal, it was, in his opinion, a good place, adequately furnished for bringing up three small children. Another

social worker testified that she investigated the Nelson home, found the house clean, "I would say almost immaculately clean, * * *. Everything seemed to be well in its place." She purposely visited the home at a time when she was not expected and observed the boy was well behaved. The children appeared to be well dressed and well nourished. The little girl's schooling was being properly carried on and the relator showed "great concern" for her children. The furniture, consisting of essentials, was in good condition. Other neighbors testified to the effect that the relator was neat, manifested a deep interest in her children, and spent a great deal of time with them.

The respondents, Byron C. and Simone S. Whaley, 37 years of age, were married at Duluth on July 3, 1947. Mr. Whaley holds a responsible executive position in the city of Duluth. His wife is a native of France whom he met while abroad in the service. They are well educated, enjoy an excellent reputation in their community, and are unquestionably devoted to the child. When Mr. Whaley was on the witness stand the court pointed out to him that the child was about seven weeks old when this proceeding was instituted and inquired if it would not have been easier to give up the baby at that time rather than give it up later if the case went against him. His answer was: "It was our baby and we just couldn't conceive of giving him up. We entered into this agreement. As far as we were concerned, everybody was willing and it was what the people wanted to do, and the thought that anyone had changed their mind—I mean it was just impossible to believe."

On the other hand, the relator is equally firm in her determination to have the child. When asked: "Could you explain more specifically why you want this child?" she answered:

"A. Well, when you have a baby, even if you have two, when that baby is born you just have that love there for that baby and you can't take and divide it between your two other children. It's there and no matter what happens, you're going to love that baby as long as you live. You can't take that love for him and give it to the other ones.

"Q. What caused you to have this change of attitude between the few days before and the present time?

"A. If you had waited until the baby was born to have me sign those papers, I would never have signed them.

"Q. What would you have done?

"A. I would have kept my baby because I would have gone to the Welfare then and would have found out I wouldn't lose my other two.

"Q. As I understand you then, to sum it up, you blame Dr. Clark for this?

"A. I certainly do."

In its findings of fact the trial court stated:

"Respondents are fit and proper persons to have and enjoy the custody of said child and the responsibility for his care, support, education and rearing.

"Relator is a long-time resident of Proctor and Duluth; that she lives at 2113 West Fifth Street with her two children in a well-kept and amply sized apartment, occuping the whole upstairs of the residence house at that address. Her principal occupation is a homemaker and her means of support consist of alimony payments from her former husband and grants in aid from the County; that her income is adequate to provide for the necessities of herself and her children. That the Relator has proven to be a good mother and is a fit person to have the custody of said child."

■ The issue presented on the record is whether the best interests of the child would be served by respondents' retention of custody or would such interests be wholly protected by the delivery of the child to the relator. The relator contends that the evidence does not establish that she abandoned the child. She asserts she is a fit and proper person to have the custody of the child and is well able to care for him adequately. Admitting the respondents may be able to provide the child with greater material benefits, she contends her natural right as a parent and her ability to care and provide for the child give her the superior right to its custody.

The respondents urge with persuasive force that in considering the basic issue as to what action will best serve the future interests and welfare of the child, the relative situations of the contesting parties should be viewed. They point out that the mother is a divorced woman living with two children in a fatherless home; that on two occasions she has become enceinte out of wedlock; that on two occasions she has feigned suicide; and that her background generally indicates a lack of character and stability. Although one of the respondents was divorced prior to her present marriage, it is contended the record establishes that the home which they provide and the care and attention which is given the child by them warrants the conclusion that the child should be left with them.

In support of the well-recognized rule of law applicable to cases involving custodial rights of children that a mother's love and affection for her child must yield to considerations of the child's welfare, the respondents cited State ex rel. Anderson v. Anderson, 89 Minn. 198, 94 N. W. 681; State ex rel. Feeley v. Williams, 176 Minn. 193, 222 N. W. 927; State ex rel. Waldron v. Bienek, 155 Minn. 313, 193 N. W. 452; Christianson v. Christianson, 217 Minn. 561, 15 N. W. (2d) 24; State ex rel. Rys v. Vorlicek, 229 Minn. 497, 40 N. W. (2d) 350; In re Guardianship of Maloney, 234 Minn. 1, 48 N. W. (2d) 313, 49 N. W. (2d) 576; Molto v. Molto, 242 Minn. 112, 64 N. W. (2d) 154.

We have examined the foregoing as well as authorities from other jurisdictions cited by the respondents. The fact pattern of Minnesota cases indicates that the rule of law for which respondents contend has been applied to those particular circumstances where, through abandonment, neglect, or similar misconduct on the part of the parents, future custody by them would be detrimental to the welfare of the child.

In State ex rel. Anderson v. Anderson, *supra,* the mother of a newly born child and a five-year-old girl requested at her death that the children be given in custody to the uncle and aunt who were without children of their own. After three years, the surviving father attempted to regain custody of the children. It appeared that the father was addicted to the use of intoxicating liquor and

was a bad influence on the children and that his habits of life were not such as to justify surrender of the children to him.

In State ex rel. Feeley v. Williams, *supra,* the 12½-year-old daughter of a deceased mother was in the custody of a relative. Her father, who had spent several years in a penitentiary, returned and attempted to get custody of her. In the intervening years he had neglected the child and contributed nothing to its support.

In State ex rel. Waldron v. Bienek, *supra,* both parents were dead and the litigation as to custody was conducted between relatives.

In Christianson v. Christianson, *supra,* the child after the divorce of her parents was placed in the care of her paternal grandparents. After 5 years the mother had remarried, and in denying custody of the child to her the court found the conditions existing in her home were (217 Minn. 563, 15 N. W. [2d] 25) "detrimental to the proper rearing and the welfare of the child."

In State ex rel. Rys v. Vorlicek, *supra,* the child was living with the sister of her deceased mother. After the mother's death the divorced father attempted to get custody of the child. In denying his claim this court said (229 Minn. 501, 40 N. W. [2d] 352):

"This case is distinguishable from those cases where a parent has temporarily been unable to provide for a child, and, as a result, its custody has been awarded to someone else. Here, over a period of more than ten years, although living in the same community, relator did not even make himself known to his child as her father."

In Molto v. Molto, *supra,* the child was the product of a broken marriage. The case involved an order of court modifying a provision for divided custody to custody in the aunt and uncle with right of visitation by the divorced parents.

In re Guardianship of Maloney, *supra,* involved the children of divorced parents who, having made a failure of their marriage, had turned the children over to a welfare agency under circumstances which amounted to neglect or abandonment.

■ The welfare and best interests of the child and the legal and natural right of the parents must both be considered in a dispute as to the custody of a child. In order to justify depriving a parent

of the custody of a child in favor of third persons there must be a grave reason growing out of neglect, abandonment, incapacity, moral delinquency, instability of character, or inability to furnish the child with needed care. The reasons must be "real, cogent, weighty, strong, powerful, serious, or grave." 67 C. J. S., Parent and Child, § 12.

In State ex rel. Platzer v. Beardsley, 149 Minn. 435, 438, 183 N. W. 956, 958, we held that there is a presumption that a mother is a fit and suitable person to be entrusted with the care of her child and the burden is upon the contestant to overcome the presumption by satisfactory evidence, and we observed:

"* * * The ties by which mother and child are bound together should not be severed except for grave and weighty reasons."

In State ex rel. Fossen v. Hitman, 164 Minn. 373, 375, 205 N. W. 267, this court speaking through Mr. Justice Holt observed that the natural parent has first right to the care and custody of the child "unless the best interests of the child require it to be given into the hands of some one else." It was pointed out that the term "best interests" did not mean an easier or more luxurious life with greater prospect of material advantages. Poverty of the parent is not sufficient ground for depriving him of the natural right to the custody of the child. The benefits to be derived from the intangibles of love and affection of a natural mother must be considered.

■ The trial court found the mother to be a fit person to have the custody of the child and has also found she has an adequate income from alimony payments and grants in aid from the county to provide for the necessities of herself and her children. Although we do not conclude, as did the learned trial court, that the child should remain with the respondents, there is set forth in full herein as a footnote his well-considered memorandum which was made a part of his findings and which aids in an understanding of the numerous facets of this unusual case.[3]

---

[3]"The fact that this Court has determined this matter in favor of the Respondents and against the natural mother of the child involved is intended as no reflection on the mother. I have merely considered this question: What

From an examination of the authorities it appears that this court has accorded to the parent a stronger claim to the custody of a child

is best from the standpoint of the child's welfare? This Court does not have to cite law to substantiate the fact that this is the fundamental rule in the State of Minnesota as well as in other Jurisdictions. There is no question that if the child remains with the Whaleys that it will have every advantage that comes from being reared in a good, normal home where poverty or need will probably never knock on the door.

"If this controversy had not arisen in the manner in which it did, and had the Relator, after the birth of the child, returned with it to her home with her two other children, it is quite likely that in the normal course of events, the Children's Division of the Welfare Department of St. Louis County would have, through gentle persuasion, suggested to the mother that the child be let out for adoption, particularly for the good of the child and incidentally for the welfare of the mother and the remaining children. I do not think that this will be denied by any of the officials of the St. Louis County Welfare Division. Unfortunately, the Whaleys did not attempt to process the adoption of the child through official and well established and respected channels. This was indeed unfortunate and the resulting confusion, chaos and heartaches indicate the need for stricter supervision in these matters.

"I believe that the mother knew what she was doing when she signed the agreement before Mr. Jenswold and Mr. Anderson, and I don't believe that either one of these attorneys attempted to coerce her or 'push her' into the deal. I believe she was under considerable emotional strain as any woman would be who expected to give birth to an illegitimate child within a matter of days. This would be particularly true because the child was illegitimate and because this young woman did not have the solace and consolation of close friends or relatives in her time of need and distress.

"I do not approve of the action of Dr. Clark in the matter in any way, regardless of what his intentions were. I am satisfied that he frightened the mother into a situation where she thought there was a possibility of losing her first two children and that he, in some manner, had created the idea in her mind that the St. Louis County Welfare Board was a bogey to stay away from. The official agencies dealing with adoptions in this County have conducted themselves with the highest propriety and there was no reason why the doctor should suggest that this giving the baby to the Whaleys should be done outside official authority and sanction.

"I believe the mother's revocation of consent is valid but this is not conclusive as far as the custody of the child is concerned. Whether this Judge or some other Judge considers the adoption matter, it is my belief that the

than the generalized statements cited by the respondents would indicate. In re Adoption of Kure, 197 Minn. 234, 236, 266 N. W. 746, 747, this court speaking through Mr. Justice Loring quoted with approval the Supreme Court of Wisconsin in Lacher v. Venus, 177 Wis. 558, 569, 188 N. W. 613, 617, 24 A. L. R. 403, to the effect that the right of a parent to the custody of a child is akin to the inalienable rights as provided for in the Constitution:

"A natural affection between the parents and offspring, * * * has always been recognized as an inherent, natural right, for the protec-

Court has the right to grant custody to the Whaleys if it is for the best interests of the child, even though there might be some technical legal obstacles in the way of formal adoption. This Court was not impressed by the fact that the Respondents were duly appointed special guardians of the person of the child through the Probate Court of this County, and believes that this action has no legal significance as far as these proceedings are concerned.

"The sole issue relied upon by this Court was what was the best thing to do considering the welfare of the child. I realize that children have been reared in homes of poverty or near-poverty, and some of the happiest homes have been the poorest ones as far as material assets and advantages are concerned. However, in this case, this child would return to a home where the mother could not possibly explain its existence except as a child born out of wedlock. It would be returned to a home where the two legitimate children of the Relator would surely look with bewilderment and surprise at the arrival of a new member of the family. In this particular case, certainly the neighborhood would be well aware that the mother had returned to her home with an illegitimate child. It would be difficult to see how this stigma could be removed, considering the notoriety that has already been attached to the case. Unfortunately, the child had already been with the Respondents for over four months before this matter was heard before this Court. I sympathize sincerely with the mother for losing the right to rear her own child but my determination has been based entirely on what I think is best for the baby boy in this case. The fact that this Court could have taken the child from the Respondents and that another Judge in this Court might yet deny them the right to adopt the child should serve as a guide to other people who desire to adopt children, that the safest and soundest way is through official channels. No matter what determination this Court has made or what the Judge considering the adoption will make, there are heartaches and anguish that could have been prevented."

tion of which, just as much as for the protection of the rights of the individual to life, liberty, and the pursuit of happiness, our government is formed. We trust that it will never become the established doctrine that the state shall say to the parents, and particularly to the mother, she who doth travail, and in great pain bring forth her child and after labor doth rejoice that the child is born, that there is but a mere privilege and not a right to the subsequent affection, comfort, and pride of and in such child."

In re Adoption of Anderson, 189 Minn. 85, 248 N. W. 657, involved the issue of adoption and not the issue of right of custody. The child was born out of wedlock and the mother surrendered custody of it to a third party. Later the mother married the putative father and opposed adoption in proceedings instituted by the third party. In sustaining the mother's position this court, speaking through Mr. Justice Stone, said (189 Minn. 86, 248 N. W. 657):

"* * * The mother seems to have met bravely the unfortunate circumstances surrounding the child's birth. She did have it placed with the Dwinnells. Since then she may not have contributed much to the child's support, but there was no intent on her part as the mother to abandon the child. Even if it could be assumed that in the distress of her unmarried motherhood she contemplated abandonment, it was but a fleeting impulse. If at one time there was temporary consent by her, it was withdrawn before commencement of this proceeding."

Aside from the fact that the record does not satisfy us that the respondents have sustained the burden of proof in establishing that the mother is unfit to have the custody of the child, we hold, on review of the record, that the respondents are without right to the possession of the child. Where a third party secures custody of an infant child by invalid means, the question of the fitness of such party to better care for the child is never reached. If we are not to be controlled by the sentimental or ethical aspects of this transaction, considerations of public policy require that we realistically appraise its social implications. We disapprove of the methods by which respondents acquired custody of the child. We

cannot escape the conclusion that no real consent was given by the mother. She signed the agreement under compulsion of fear and anxiety. She could not act on equal terms with the formidable individuals who represented the respondents. They attempted to contract with her for the transfer of a child yet unborn by the terms of which the respondents reserved the right not to keep it. An agreement which, in effect, transfers from the natural mother to total strangers the right to keep, return, or otherwise dispose of her unborn child without her further consent is void and contrary to public policy. M. S. A. 257.02.

■ A physician should not let his zeal for a patient's interests prompt him to use the opportunities of his profession to effectuate the transfer of a child to nonrelatives. The observations of the trial judge, as set forth in his memorandum, with reference to the conduct of the doctor are well stated and fully supported by the record. While we do not impugn the integrity of the attorneys who represented the respondents, this case demonstrates that, no matter how keen a lawyer's sense of social obligation may be, his training is inadequate in dealing with the imponderables of this kind of human conflict. This field of service should be left to the established social agencies with personnel trained to avoid the grave emotional toll which has resulted here.

The respondents would probably qualify as proper persons to have the custody of the child under established welfare agency standards. But the right of the mother here is paramount to the claims of the respondents. The child belongs to her. Notwithstanding the fact that she has erred, the law recognizes her claim to the child as a compelling natural right which derives from the deepest instincts and the highest nature of motherhood.

The order appealed from is reversed and the case is remanded to the district court for its further order directing the return of the minor, Philip John Nelson, to his mother, Claryce Elaine Nelson, at such time and in such manner as the district court may direct not later than sixty days from the filing hereof.

Reversed.