IN RE PETITION OF FRANK D. ALSDURF AND ANOTHER
FOR ADOPTION OF DEBRA SUE SADLER.
STATE EX REL. CHARLOTTE L. SADLER v. FRANK D.
ALSDURF AND ANOTHER.

133 N. W. (2d) 479.

February 5, 1965—Nos. 39,274, 39,275.

*Walter A. Schweppe,* for appellant.
*Bert Nygaard,* for respondents.

OTIS, JUSTICE.

These proceedings are brought to secure the adoption of an illegitimate infant by her foster parents and are consolidated with a petition by the natural mother to regain the legal custody of her daughter. The appeal is from a judgment granting the adoption and denying the mother relief.

The natural mother, appellant Charlotte L. Sadler, gave birth to a daughter, Debra Sue Sadler, on February 24, 1962, in a Minneapolis hospital where respondent Lorraine Alsdurf was employed. While still confined, Miss Sadler signed two separate documents purporting to give the Alsdurfs her consent to the adoption. Neither instrument contained the signatures of two subscribing witnesses as required by Minn. St. 259.24, subd. 5,[1] but each was witnessed by a different person.

As she left the hospital on February 28, Miss Sadler physically delivered the child to Mrs. Alsdurf. Because the consent was defectively witnessed, the Alsdurfs' attorney left a number of telephone messages for Miss Sadler, attempting to rectify the omission. On September 17,

---

[1] "All consents to an adoption shall be in writing, executed before two competent witnesses and acknowledged by the consenting party, and shall be filed in the adoption proceedings at any time before the matter is heard."

1962, he reached Miss Sadler and advised her of the necessity for securing a second witness. She refused to cooperate and immediately consulted an attorney to initiate proceedings to regain custody. On the basis of what the Alsdurfs' attorney deemed to be an adequate attestation, based on a telephone conversation between his wife and Miss Sadler, the former signed the consent as a witness, and the petition for adoption was thereupon filed on October 15, 1962.

Miss Sadler formally petitioned for the withdrawal of her consent on November 16, 1962, pursuant to § 259.24, subd. 6, which provides as follows:

"After a petition has been filed, the consent to the adoption may be withdrawn only upon order of the court after written findings that such withdrawal is for the best interest of the child."

Hearings were conducted by the juvenile division of the Hennepin County District Court in December 1962 and January 1963, resulting in the court's determination that Miss Sadler's consent was valid, the Alsdurfs were fit parents, Miss Sadler had no prospect of making a complete home, and the best interests of the child required that she remain with the Alsdurfs.[2] This appeal followed.

Resolving the conflicts in evidence in favor of the prevailing parties, it is nevertheless difficult to read this record without concluding that the natural mother has been the victim of misguided meddling and of-

---

[2]The text of this order dated August 27, 1963, denying a motion for amended findings is as follows: "It is the opinion of the Court (1) that the mother, an intelligent woman with some knowledge of law and legal proceedings, validly consented to the placement of her child with petitioners for adoption; (2) that the petitioners are fit and proper adoptive parents, though with some inadequacies; (3) that the direct placement of the child is to be deplored since it inhibited a possibly more suitable placement and since the whereabouts of the child will be known to the mother with consequent potential confusion; (4) that the alternatives currently available to the Court are granting the adoption or returning the child to its mother; (5) that the mother has not now or prospectively a complete home for the child; (6) that the best interests of the child will be served by continuing and solidifying its membership in a family where it has, and will, receive more than adequate love and care and proper guidance."

ficious pressures on the part of persons who were bent on persuading her to part with the custody of her infant daughter. It is manifest that Miss Sadler is an intelligent, well-bred, self-reliant young woman who in a time of anguish and distress found herself driven to relinquish her child by forces which she was unable to resist.

By the court's own findings, it is clear that the consent was defective; the mother is qualified in every respect to rear and educate her child; and the Alsdurfs are "neither in their ages nor in their economic status nor in their rigidity consistent with the normal high expectations for adoptive parents." In reaching its conclusions the court rejected the recommendations of both the county and state welfare departments.[3]

1. The statute has wisely provided strict safeguards for preventing children from being wrested from their parents except upon a clear expression of the parents' intent. The consent must be in writing, executed before two competent witnesses, and acknowledged. In the instant case no such document exists. The trial court has treated two separate, ineffective writings as one instrument sufficient to meet the requirements of the statute. However, we believe that in a matter which involves the dissolution of a relationship as intimate and enduring as that of a parent and child, there should be strict adherence to the letter of the law. The consent accompanying the formal petition for adoption, which is the basis for these proceedings, contains the signature of only one valid witness and we hold it is therefore ineffective to terminate parental rights.

2. From the moment Charlotte Sadler first consulted her doctor on February 5, 1962, she was subjected to pressures from every source. At the doctor's suggestion, a representative of the Hennepin County Welfare Board called on Miss Sadler at her place of employment the day before the child was born. Miss Sadler's testimony that she told

---

[3] "* * * It goes without saying that not all proposed adoptions are for the best interests of the child and that undoubtedly the findings of an accredited association dedicated to finding adoptive homes for dependent and neglected children should be given great weight by the district court; * * *." In re Adoption of Zavasky, 241 Minn. 447, 453, 63 N. W. (2d) 573, 577.

the social worker she did not want to part with her baby is uncontradicted. Nevertheless, she consented to release her to the welfare department on a temporary basis. Shortly after the birth of the child, a hospital employee, characterized by the court as a self-styled unofficial social worker, intruded herself, uninvited, into Miss Sadler's double room for the admitted purpose of assisting Mrs. Alsdurf, a fellow employee at the hospital, to secure the infant for adoption. She joined Mrs. Alsdurf on February 27 in discussing with Miss Sadler the relinquishment of custody at a time when Miss Sadler was weeping and obviously distraught. The same evening the Alsdurfs' attorney presented a consent for Miss Sadler's signature. During all of this period, when the doctor, the welfare department, the hospital official, the adoptive mother, and her lawyer were wittingly or unwittingly bringing pressure to bear on Miss Sadler, she received no disinterested counsel designed to protect her against an ill-advised and impulsive decision at a time of physical and emotional distress.[4]

We do not concur in the court's conclusion that Miss Sadler has rejected her child from before its birth until it was 9 months old. Her uncontradicted testimony indicates she expressed her devotion and concern throughout all the difficult period of her confinement and recovery. The day after she discovered that a defect in her consent might prevent her from being divested of all her rights to custody she consulted an attorney. She thereafter vigorously and persistently prosecuted the trial and appeal of her cause through the courts. Had her counsel acted more promptly and withdrawn her purported consent before the petition for adoption was filed, she would have had an absolute right to secure the return of her infant.[5]

---

[4]"* * * At the time her child is born the unwed mother is usually emotionally distraught. Also, unwed mothers are often seriously neurotic and have difficulty making decisions based on realistic considerations. This mother is particularly vulnerable to efforts, well-meaning or unscrupulous, to persuade her to sign a consent. Such consents may be executed under circumstances not amounting to legal fraud or duress; but their voluntary nature may be questioned." 28 U. Chi. L. Rev. 570.

[5]In re Adoption of Anderson, 189 Minn. 85, 86, 248 N. W. 657; In re Adoption of Kure, 197 Minn. 234, 236, 266 N. W. 746, 747.

The record indicates that Miss Sadler was a young woman 37 years of age and, apart from this single dereliction, is of good moral character, holding a responsible position as a legal secretary, well able to care for her child, earning a salary of $400 a month. Her parents were persons of better than average social and economic standing, her father being in business for himself and her brother and sisters being respectable and well placed. It is obvious that Miss Sadler is the product of a stable environment. She is anxious to rear and educate the child, and there is every indication that if she is given the opportunity she will devote herself to that purpose. She testified that she loved the child and wanted to raise her "as my own the way God intended it." When Mrs. Alsdurf offered to pay Miss Sadler's confinement expenses, she declined, stating, "I am not selling the child." The Alsdurfs, on the other hand, entered into a stipulation with Miss Sadler, executed by all of the parties and their attorneys, under which the Alsdurfs agreed in writing with all due formality to dismiss their petition for adoption and deliver to the welfare department forthwith physical custody of Miss Sadler's baby pending a further investigation of Miss Sadler's plans, upon the payment to them of $2,000 by Miss Sadler. The court has found that these so-called reimbursements were unreasonable and represented expenses unrelated to the welfare of the child and disapproved the agreement. The welfare department has made adverse recommendations, stressing the dangers inherent in a natural mother's knowledge of the adopting parents' identity and noting that the child had high potential which it was doubtful would be realized because of the inability of the Alsdurfs "to provide the proper stimulation and educational opportunities." The Alsdurfs have previously been refused an adoptive child by another agency.

While on the one hand the trial court properly expressed its primary interest in the child's welfare, on the other hand it spoke of the mother's being *estopped* from asserting her rights, and noted the harsh effect a change would have on the adoptive parents. Under all of the circumstances, we hold it was error for the court to refuse the mother permission to withdraw consent which was given at a time when she was "emotionally agitated," as the court found.

The law in this state is well settled that it is in the best interest of a child to be brought up by the mother unless she is wholly unequal to such responsibility. In the instant case the Alsdurfs have the burden of proving the mother's unfitness.[6] Under our law a mother is presumed to be a suitable person to be entrusted with the care of her child and has a right to custody superior to any other person.[7] Our attitude has been well expressed in State ex rel. Ashcroft v. Jensen, 214 Minn. 193, 195, 7 N. W. (2d) 393, 394, where we stated:

"* * * Ordinarily, parents are entitled to the custody of their child. Every court recognizes the deep and enduring affection which parents have for their children and their willingness to make sacrifices and endure hardships in their interests which a stranger would not consider. No court would deprive a parent of his child simply because someone else might give it better care or attention than the means of the parent permit."

More recently our views were expressed in In re Petition of Parks, 267 Minn. 468, 474, 127 N. W. (2d) 548, 553:

"* * * The correlative *rights and duties inherent in the parent-child relationship are natural rights of such fundamental importance that it is generally held that parents should not be deprived of them 'except for grave and weighty reasons.'* In an adoption proceeding, where an absolute severance of this relationship is sought, the consent provisions are designed to protect the natural rights of a parent to the custody, society, comfort, and services of the child. These rights were protected by the common law. Since the statute is in derogation of the common law, it is quite uniformly held that provisions abrogating the necessity

---

[6]State ex rel. Platzer v. Beardsley, 149 Minn. 435, 438, 183 N. W. 956, 957; State ex rel. Nelson v. Whaley, 246 Minn. 535, 545, 75 N. W. (2d) 786, 792; In re Welfare of Barron, 268 Minn. 48, 127 N. W. (2d) 702.

[7]State ex rel. Lehman v. Martin, 95 Minn. 121, 103 N. W. 888; In re Dependency of Klugman, 256 Minn. 113, 97 N. W. (2d) 425; In re Adoption of Kure, 197 Minn. 234, 236, 266 N. W. 746, 747; In re Baby Girl Larson, 252 Minn. 490, 496, 91 N. W. (2d) 448, 453; Eisel v. Eisel, 261 Minn. 1, 5, 110 N. W. (2d) 881, 884.

of parental consent be construed strictly in favor of the parent and the preservation of the relationship." (Italics supplied.)

To the same effect are State ex rel. Platzer v. Beardsley, 149 Minn. 435, 438, 183 N. W. 956, 958; State ex rel. State Bd. of Control v. Probate Court, 150 Minn. 16, 20, 184 N. W. 27, 29; In re Adoption of Pratt, 219 Minn. 414, 427, 18 N. W. (2d) 147, 154; and State ex rel. Nelson v. Whaley, 246 Minn. 535, 544, 75 N. W. (2d) 786, 792. In the Whaley case, closely paralleling the facts in the instant case, there was an attempt at a direct placement. We reiterated with approval the principle that the right of a parent to the custody of a child is akin to the inalienable rights protected by the Constitution (246 Minn. 547, 75 N. W. [2d] 794):

"A natural affection between the parents and offspring * * * has always been recognized as an inherent, natural right, for the protection of which, just as much as for the protection of the rights of the individual to life, liberty, and the pursuit of happiness, our government is formed."

In Whaley, as here, the consent was given under emotional stress in the face of formidable pressures by officious persons attempting "to contract with her for the transfer of a child yet unborn." In returning the infant to its mother we deplored, in passing, the practice of physicians and attorneys arranging direct adoptions without acting through established social agencies, and stated (246 Minn. 549, 75 N. W. [2d] 795):

"* * * Notwithstanding the fact that she has erred, the law recognizes her claim to the child as a compelling natural right which derives from the deepest instincts and the highest nature of motherhood."[8]

In conclusion we hold that the petition fails to contain a consent which meets the strict requirements of the statute; that there is no evidence the natural mother is unfit to rear her child; that she acted with diligence when she learned that her rights had not been irrevocably foreclosed; that the court erred in ignoring the determination of both

---

[8]See, Annotation, 98 A. L. R. (2d) 417.

the county and state welfare departments that the adoption would be "wholly in consideration of the adoptive parents and not in consideration as to what would give the greatest happiness and be in the best interest of the child"; and that the best interests of the child require that she be restored to the custody of her natural mother.

The judgment is therefore reversed and remanded with directions to enter judgment denying respondents' petition for adoption, granting appellant's petition to withdraw her consent, and awarding permanent custody of Debra Sue Sadler to her natural mother, Charlotte L. Sadler.

Reversed and remanded.

SHERAN, JUSTICE (concurring specially).

1. While I believe that the trial court was justified in light of our prior decisions[1] in holding that a substantial compliance with the requirements of Minn. St. 259.24, subd. 5, made the written consent of the child's mother effectual, I am willing to accede to the view of the majority that in a case such as this there should be strict adherence to the letter of the law. Applying a strict construction, the conclusion that the consent in this case was not executed as required by the statute is acceptable because although the child's mother consented to the adoption in writing and before two competent witnesses, she did so by executing two separate documents, each of which was witnessed by one person only.

2. The determination that the consent to the adoption was not executed before two competent witnesses within the meaning of § 259.24, subd. 5, disposes of the case. In the absence of valid consent, the mother has an absolute right to the custody of the child unless proved unfit. There was no attempt in this case to establish unfitness.

3. I respectfully disagree with the balance of the opinion in so far as it implies that the determination of the trial court with respect to the best interests of the child is without support in the evidence, it being my impression that his evaluation of the situation, based as it

---

[1] See, Kenning v. Reichel, 148 Minn. 433, 182 N. W. 517, 16 A. L. R. 1016; In re Adoption of Anderson, 235 Minn. 192, 50 N. W. (2d) 278; In re Petition of Jordet, 248 Minn. 433, 80 N. W. (2d) 642.

was upon a firsthand observation of the parties during the course of two separate hearings on 4 days over a 4-month period, was the product of a sound and informed judgment prudently exercised in a distressing situation.