In the Matter of:   Barbara BAKER,
Petitioner, Appellant,

v.

James BAKER, Respondent.

No. C0–91–1967.

Supreme Court of Minnesota.

Dec. 31, 1992.

M. Sue Wilson, Christine N. Howard, Minneapolis, for appellant.

James H. Manahan, Manahan, Bluth, Green, Friedrichs & Marsh Law Office, Mankato, for respondent.

Lorraie S. Clugg, Chairperson, Family Law Section, William E. Haugh, Jr., Chairperson, Amicus Curiae Committee and Mary Lauhead, St. Paul, amicus curiae Family Law Section of Mn. State Bar Assn.

GARDEBRING, Justice.

This case arises from appellant Barbara Baker's application in district court for an order for protection under the Domestic Abuse Act, Minn.Stat. § 518B.01 (1990), against her estranged husband, James Baker. Based upon her affidavit and motion, the trial court issued an *ex parte* temporary restraining order that excluded James Baker from Barbara Baker's residence and restrained him from harassing her at work. The court also granted temporary custody of the couple's infant to the mother, with provisions for visitation by the father. James Baker was notified pursuant to the statute, and at the subsequent full hearing, the court found that each party was entitled to an order for protection. The court then ordered that temporary custody of the infant remain with Barbara Baker, and extensive unsupervised visitation with James Baker was scheduled.

Consequently, James Baker filed a notice of appeal. The court of appeals reversed the trial court's *ex parte* order for protection and remanded the temporary child custody determination for particularized findings which reflect the dissolution standards of best interests of the child. *Baker v. Baker*, 481 N.W.2d 871 (Minn.Ct.App.1992). Barbara Baker appeals from the decision of the court of appeals. We reverse.[1]

Barbara Baker was 18 years old when she married 19-year-old James Baker in 1991. The couple's only child was born on May 19, 1991. Both parents worked at part-time jobs during the summer of 1991; when one parent was working, the other cared for the baby and when both were working, the baby was cared for by others. During the school year, both parents attended school and worked part time. Throughout the summer of 1991, tension escalated between the couple to the point that on one occasion, James threatened to kill Barbara, and punched her while she was holding the baby.

On August 30, 1991, Barbara moved out of the marital home with the baby and moved in with her aunt. After working that day, Barbara and James both separately went to the child care provider's home, where an argument began. Barbara left with the baby and went to her aunt's home. James followed and forced his way into the home and later, kicked and pushed Barbara. Barbara called the police, who arrived and removed James. James was issued a citation for fifth degree assault. James returned to Barbara's home after being released by the police, but was denied entry.

On September 3, 1991, James went to Barbara's new home and attempted to take the baby from the aunt. Barbara arrived home and an argument began. After Barbara removed her car keys from James' key ring and while she was putting them on her own key ring, James grabbed her, dragged her from the house, threw her to the ground and swung at her. James denied knocking Barbara down and claimed instead that she jumped on him and tore his

[1.] On September 10, 1992, respondent filed a motion seeking dismissal of this appeal, on the theory that the issues have been rendered moot. It is true that since the inception of this action, the Bakers have legally divorced. While this decision, therefore, may have no impact upon these parties, the question is not moot. The issues presented are capable of repetition, yet evade review because restraining orders are short term and temporary, and custody is at issue in countless domestic abuse proceedings. *In re Schmidt*, 443 N.W.2d 824, 826 (Minn. 1989).

shirt. The police were called again, but James had fled. James drove by afterwards and threw the keys at Barbara as she sat on the front steps. Barbara was treated at the hospital for an injury to her hand.

On September 5, 1991, Barbara filed a motion for an *ex parte* order for protection, along with an affidavit setting forth the described incidents of abuse. A temporary order for protection was issued, granting temporary custody of the couple's infant to Barbara, with supervised visitation to James. A full hearing was set for September 12, 1991.

James secured the services of an attorney, and filed a counter motion requesting an order for protection against Barbara and temporary custody of the child. At the September 12 hearing, the court took testimony on the issue of custody, and then reaffirmed its previous grant of custody of the child to Barbara, with visitation authorized for James.

The full hearing on the motions for protective orders was continued until September 20. At that time the court received additional evidence regarding both custody and the alleged abuse, and then restrained both parties from contact with the other and excluded each from the other's residence. The trial court ordered that temporary custody of the infant remain with Barbara for up to one year, unless amended before then by further court order. James was granted extensive, unsupervised visitation rights.

James Baker, through his attorney, appealed the *ex parte* order and grant of temporary custody. Barbara Baker remained unrepresented by any counsel and did not file a respondent's brief in the court of appeals. The court of appeals considered the appellant's brief alone, without the benefit of oral argument.

The court of appeals held that domestic abuse proceedings are governed by Minn. R.Civ.P. 65.01, which requires notice before temporary restraining orders may be granted unless it is clear that immediate and irreparable injury, loss or damage will result, and the applicant's attorney gives written notice to the court of the efforts that have been made to give notice, or the reasons for not giving notice. The court noted that the printed petition and temporary order for protection forms in use in Blue Earth County both recite the existence of an emergency but called its presence "inconclusive on the topic of cause to withhold notice." *Baker v. Baker*, 481 N.W.2d at 873, n. 3. The court reversed the *ex parte* order for failure to give notice or state the reasons why notice was not required.

The court of appeals also concluded that certain statutory provisions relating to restraining orders in the context of marriage dissolution proceedings, Minn.Stat. § 518.131 (1990), are in *pari materia* with the provisions of the Domestic Abuse Act. Accordingly, the court held that custody and visitation determinations in an *ex parte* order for protection are governed by Minn. Stat. § 518.131, subd. 3(b), which requires a finding by the court of "immediate danger of physical harm to the minor [child]." Since the trial court had made no such finding, the court of appeals reversed the trial court's *ex parte* temporary custody award.

Finally, the court of appeals determined that the temporary custody determination made in the subsequent order for protection required particularized findings based upon the best interests of the child, citing Minn.Stat. § 257.025(a) (1990) and *In re Marriage of Schmidt*, 436 N.W.2d 99 (1989). Since the temporary award of custody of the Baker child did not contain these findings, the court of appeals remanded the custody dispute for further trial court consideration.

This case presents three distinct issues: 1) Must a proceeding for temporary relief under the Domestic Abuse Act, Minn.Stat. § 518B.01, conform to notice requirements contained in Minn.Gen.R.Prac. 303.04 and Minn.R.Civ.P. 65.01 before an *ex parte* order may issue?

2) Is a finding of "immediate danger to the [child]," pursuant to Minn.Stat. § 518.131, subd. 3(b), necessary before a tempo-

rary custody determination can be made within an order for protection?

3) How particularized must the findings be to support such temporary custody determinations?

The law governing the legal relationships between men and women, and their children, is complex, reflecting the potentially conflicting policy objectives of preserving families and protecting children, of allowing divorce and ensuring support, of protecting victims and assuring due process. Furthermore, its development has been incremental, reflecting that social attitudes on all of these difficult issues have been rapidly changing in the last several decades.

At issue in this case is the interplay between three of the statutes which govern related, but distinct problems: the Domestic Abuse Act, Minn.Stat. ch. 518B, which outlines a mechanism for the court to provide protection for individuals who are threatened by their family or household members; the statute governing marriage dissolution, Minn.Stat. ch. 518; and Minn. Stat. ch. 257, which relates to the welfare of children. The court of appeals has inexplicably chosen to interweave the requirements of these statutory provisions even though they were adopted by the legislature at different times, manifest different objectives and deal with different subject matters.

We begin first with the Domestic Abuse Act. In 1978, it was estimated there were 26,900 assaults upon women by their partners. Minn. Dep't of Corrections, *Minnesota Program for Battered Women*, Biennial Report 1986–87, p. 12. Shelters housed 613 women plus 726 children. *Id.* Another 2,136 requests for shelter could not be accommodated. *Id.*[2]

The Domestic Abuse Act, Minn.Stat. § 518B.01, was enacted in 1979 as one way to protect victims of domestic assault. It is a substantive statute which is complete in itself, carefully drafted to provide limited types of relief to persons at risk of further abuse by other "family or household members," whether married or not. It neither establishes nor terminates a legal relationship; it requires a demonstration of physical harm, or fear, or sexual misconduct, and the relief it provides is of limited duration. In one sense, it may be thought of as a "band-aid," designed to curtail the harm one household member may be doing to the other in the short term, until a more permanent dispute resolution can be put in place. Nothing within the plain wording of the statute suggests that reference to any other statute is necessary.

In contrast, the marital dissolution statute, Minn.Stat. ch. 518, is a complex scheme designed to detail the procedures for termination of a particular kind of legal relationship, marriage between a man and woman. Its sixty-five sections cover, among other topics, the grounds for divorce, the process for division of property, and the nature of the on-going obligations of one party to the other, including those related to financial support. It is broader than the Domestic Abuse Act, in that it covers virtually all legal aspects of the end of a relationship and is intended to provide for closure of the issues at hand, except in circumstances it carefully spells out. It is narrower in that it only covers marriage, and not the many other kinds of human relationships which may be covered by the Domestic Abuse Act. While the reach of the two statutes may incidentally overlap as to some married persons in some situations, each serves a distinct and separate public policy. Each serves different purposes and may be appropriate for different persons.

Similarly, Minn.Stat. ch. 257 relates primarily to the welfare of children, in contexts other than domestic abuse. It includes such matters as surrender of parental rights, foster home placement, declaration of parentage, and certain custody and

---

**2.** By 1985, 17 shelters statewide housed 2700 women plus 3500 children. However an additional 5700 requests for shelter went unmet. Minn. Dep't of Corrections, *Minnesota Program for Battered Women*, Biennial Report 1986–87, p. 5. From June 1986 through July 1, 1988, 16,000 requests for safe shelter were met, while close to 9,000 were not. Minn. Dep't of Corrections, *Program for Battered Women, Data Summary* (July 1, 1986 through June 30, 1988).

visitation determinations which may involve married or unmarried partners, extended family, or unrelated persons.

Nothing in the language of these three statutes suggests that they are related to one another, nor do they contain any explicit mandate to construe them together. On the contrary, the domestic abuse proceeding "shall be in **addition** to other civil or criminal remedies." Minn.Stat. § 518B.01, subd. 16, (emphasis added).

The danger of muddling together these three distinct and targeted statutory schemes is perfectly illustrated in this case: the availability of extraordinary relief intended by the passage of the Domestic Abuse Act is utterly negated by tying to it unnecessary external procedural requirements. It is in this context then that we examine the specific issues before us.

## I.

■ Court procedural rules such as Minn.R.Civ.P. 65.01 and Minn.Gen.R.Prac. 3.01 and 303.04 provide a framework to guide the bench in the majority of cases. However, some statutory remedies incorporate alternative procedures as part of the substantive relief made available. The Domestic Abuse Act provides such a scheme:

an *ex parte* restraining order is central to the substantive relief provided for under the Act. If notice, or extensive justification for the lack thereof, were required, the order would not provide the kind of immediate remedy that the Domestic Abuse Act, as a whole, contemplates.[3]

Furthermore, prior notice to the respondent could be counter-productive to the purposes of the statute. As noted by the U.S. District Court for the Western District of Wisconsin in interpreting a similar statute, such notice might, in fact, incite further domestic violence. *Blazel v. Bradley,* 698 F.Supp. 756, 763 (W.D.Wisc.1988).[4]

It can also be argued that, even if the several rules cited by the court of appeals are controlling, the procedures spelled out in the Domestic Abuse Act comply with those rules. The more stringent of these rules, Minn.R.Civ.P. 65.01, allows *ex parte* relief if two conditions are met: (1) a clear demonstration from specific facts show that immediate and irreparable injury will result before the adverse party can be heard, and (2) a written statement by petitioner's attorney of the reasons why notice should not be given.

While there is usually no attorney involved in a petition for an order for protec-

**3.** The 1992 legislature has amended the Act to make it clear that prior notice to the alleged abuser is not required.

A finding by the court that there is a basis for issuing an *ex parte* temporary order for protection constitutes a finding that sufficient reasons exist not to require notice under applicable court rules governing applications for *ex parte* temporary relief.

Minn.Stat. § 518B.01, subd. 7(a) (1992).

This amendment was effective April 30, 1992 and, therefore, does not apply in this case.

**4.** At least one state statute specifically notes this danger in its statute for an Emergency Order of Protection.

An emergency order of protection shall issue if petitioner * * * establish[es] that * * * [t]here is good cause to grant the remedy, regardless of prior service of process or of notice upon the respondent, because * * * the harm which that remedy is intended to prevent would be likely to occur if the respondent were given any prior notice, or greater notice than was actually given, of the petitioner's efforts to obtain judicial relief * * *.

Ill.Ann.Stat. ch. 40, ¶ 2312–17, § 217(a)(3)(i) (Smith–Hurd 1992).

Extensive research on domestic abuse supports the assertion that the risk of danger increases once the victim makes the choice or attempts to leave the abusive relationship. *See,* Lerman, *A Model State Act: Remedies for Domestic Violence,* 21 Harv.J. on Legis. 61, 91 (1984) ("[I]f the victim of abuse tells the abuser that she might seek help, he may respond by threatening more serious violence.") (citing D. Martin, *Battered Wives,* 77–81 (1976)); Comment Quinn, *Ex Parte Protection Orders: Is Due Process Locked Out?,* 58 Temp.L.Q. 843, 870 (1985) ("The defendant might react to the news of a victim's action with anger or increased violence.") (citations omitted); *See also,* Buda and Butler, *The Battered Wife Syndrome: A Backdoor Assault on Domestic Violence,* 23 J.Fam.L. 359, 365 (1985) ("The misdemeanor status of wife-beating often serves to compound the problem * * * [by] incit[ing] anger and greater violence."); Comment Kieviet, *The Battered Wife Syndrome: A Potential Defense to a Homicide Charge,* 6 Pepp. L.Rev. 213, 218 (1978) ("[T]he husband may be incited to further abuse his wife throughout the entire process preceeding [sic] the issuance of a contempt citation or restraining order.").

tion, the Domestic Abuse Act requires that an *ex parte* order may issue only when the petition alleges "an immediate and present danger of domestic abuse," Minn.Stat. § 518B.01, subd. 7(a), and the petition must be "accompanied by an affidavit made under oath stating the specific facts and circumstances from which relief is sought." *Id.* at subd. 4(b). The pre-printed petition itself recites that "[a]n emergency exists and [that] the petitioner fear[s] immediate and present danger of further acts of domestic violence." These requirements appear to meet the provisions of the rule, especially where it is undisputed that notice to the opposing party could exacerbate the risk of abuse, thus rendering moot the request for relief.[5]

We believe it is irrelevant whether the statute provides for separate, explicit procedures tailored for the domestic abuse setting or whether the statutory procedures fully comply with the requirements of the rules. In either case, the policy behind the requirements is implemented: in extraordinary circumstances, where risk of injury is plain, relief may be granted without notice. We hold that a petition which asserts a fear of further acts of domestic violence, accompanied by a supporting affidavit under oath, meets the requirements of Minn. R.Civ.P. 65.01 and Minn.Gen.R.Prac. 3.01 and 303.04, as well as the requirements of the Domestic Abuse Act.

■ Even though statutes and rules may permit *ex parte* restraining orders, the respondent has due process rights which must not be violated. The requirements of due process are flexible and call for such procedural protections as the particular situation demands. The main factors to consider are: (1) the private interests to be affected by the official action; (2) the risk of erroneous deprivation of these interests and the probable value of additional safeguards; and (3) the government interests involved. *Mathews v. Eldridge,* 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18 (1976).

■ There are two potentially protected "private interests" at issue here:[6] (1) the exclusion from a shared dwelling; (2) the liberty interest of a parent in custody of his or her children. In addition to restraining the respondent from committing acts of domestic abuse, the temporary order may exclude the respondent from a shared dwelling, or from the residence or place of employment of the petitioner. Minn.Stat. § 518B.01, subd. 7(a).[7]

The *ex parte* order in this case also granted temporary custody of the infant to the petitioner, with visitation to the respondent. While both parents have strong interests in the custody and enjoyment of their child, a parent's love and affection must yield to considerations of the child's welfare.[8] *State v. Whaley,* 246 Minn. 535,

5. The 1992 legislature has amended the Domestic Abuse Act regarding forms by adding subdivision 21.

   The state court administrator, in consultation with the advisory council on battered women, city and county attorneys, and legal advocates who work with victims, shall develop a uniform order for protection form that will facilitate the consistent enforcement of orders for protection throughout the state.

   Domestic Abuse Act, ch. 571, art. 6, sec. 9, 1992 Minn.Laws 2032.

6. The party has no right to commit acts of domestic abuse, of course. The petitioner has a protected liberty interest in personal security. *Ingraham v. Wright,* 430 U.S. 651, 673, 97 S.Ct. 1401, 1413, 51 L.Ed.2d 711 (1977).

7. In this case, the petitioner had moved from the shared dwelling and the respondent was merely restrained from entering the petitioner's

new residence, a right the respondent never possessed.

8. Even in cases such as this one where no physical abuse of the child has been alleged, the child suffers emotional distress at seeing a parent abused by another. Quinn, *Ex Parte Protection Orders: Is Due Process Locked Out,* 58 Temp. L.Q. 843, 844 (1985). In addition, children exposed to violence "may reproduce their parents' behavior as adults." Taub, *Ex Parte Proceedings in Domestic Violence Situations: Alternative Frameworks for Constitutional Scrutiny,* 9 Hofstra L.Rev. 95, 96 (1980).

   One study estimated that up to 50% of those involved in domestic violence grew up in violent homes. Quinn, *Ex Parte Protection Orders: Is Due Process Locked Out,* 58 Temp.L.Q. 843, 844 n. 4. *See also,* United Nations, *Violence Against Women in the Family,* 24 (1989) (citing a 30 year longitudinal study that showed ongoing parental conflict and violence as "significantly predictive

75 N.W.2d 786, 791 (1956). As we will discuss in Section II of this opinion, the Domestic Abuse Act recognizes the preeminence of the child's welfare by allowing an award of temporary custody only "on a basis which gives primary consideration to the safety of the victim or the children." Minn.Stat. § 518B.01, subd. 6(a)(3).

The second *Mathews* factor goes to the risk of erroneous deprivation of the private interests and the probable value of additional safeguards. *Mathews*, 424 U.S. at 335, 96 S.Ct. at 903. We conclude that the Domestic Abuse Act provides extensive procedural safeguards which guard against such error. The *ex parte* order must be based upon an application for an order for protection supported by a sworn affidavit alleging specific facts and circumstances of past abuse. Minn.Stat. § 518B.01, subd. 4(b). Only judges or referees may issue such orders. *Id.* at subd. 3. The *ex parte* order is very short term, *id.* at subd. 7(b) and the respondent must be given notice of the full hearing. *Id.* at subd. 5(a). The only additional procedural safeguard possible would be a requirement of notice to the respondent before an order was granted. This would result in unnecessary and possibly dangerous time delays.

Finally, we must consider the third *Mathews* factor, the government interests involved. While at first blush, it may seem that the interest at issue here is a purely private one, that is, individual freedom from further domestic assault, it is also true that the general public has an extraordinary interest in a society free from violence, especially where vulnerable persons are at risk. This is the reason that criminal prosecutions are brought in the name of the state, for example.

In another key case, *Fuentes v. Shevin*, 407 U.S. 67, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972), the Supreme Court discussed the characteristics of the "extraordinary situations" which justify postponing notice and opportunity for hearing. First, the deprivation of the property interest must be "directly necessary to secure an important governmental or general public interest." *Id.* at 91, 92 S.Ct. at 2000. Second, there must be "a special need for very prompt action." *Id.* Third, the state must keep strict control over the process by limiting its authorization to a government official acting under "the standards of a narrowly drawn statute." *Id.*

We believe that the domestic abuse situation shares these characteristics with other situations where *ex parte* relief has been allowed. First, it is not necessary to recite again the state's strong interest in preventing violence in a domestic setting. Second, inasmuch as the statute requires an allegation of an "immediate and present danger of domestic abuse," Minn.Stat. § 518B.01, subd. 7(a), there can be no argument that a special need for prompt action is shown. Finally, the statute is very narrowly drawn and, of course, compliance with its terms must be determined by a district court judge or other judicial officer before *ex parte* relief is available.

After reviewing the application of both the general *Mathews* factors and the more specific *Fuentes* factors to these facts, we conclude that there is no due process violation in the granting of *ex parte* relief pursuant to the Domestic Abuse Act.[9]

of serious adult personal crimes (*e.g.*, assault, attempted rape, rape, attempted murder, kidnapping and murder)"). In a study involving families that experienced domestic violence, 87% of the women reported that their children were aware of the violence. Note, Keenan, *Domestic Violence and Custody Litigation: The Need for Statutory Reform*, 13 Hofstra L.Rev. 407, 418 n. 80 (1985).

**9.** Various other courts have considered and rejected due process violations in *ex parte* orders. *See, Schramek v. Bohren*, 145 Wis.2d 695, 429 N.W.2d 501, 505–06 (App.1988) (court finding of reasonable basis for the legislature's creation of special procedures in situations of abuse by family or household members); *Sanders v. Shephard*, 185 Ill.App.3d 719, 133 Ill.Dec. 712, 717, 541 N.E.2d 1150, 1155 (1989) (no procedural due process defect when an *ex parte* order issued upon supportive affidavits demonstrating exigent circumstances); *Grant v. Wright*, 222 N.J.Super. 191, 536 A.2d 319, 323 (App.Div. 1988), *cert. denied*, 111 N.J. 562, 546 A.2d 493 (1988) (legislature was careful to balance the rights of the defendants and the victims); *Marquette v. Marquette*, 686 P.2d 990, 996 (Okla.Ct. App.1984) (noting the need to protect victims from domestic assault and the emotional distress placed upon children witnesses, along with

## II.

■ We next turn to the question of whether a temporary custody determination entered as part of an order for protection under the Domestic Abuse Act must conform to the requirements of *ex parte* temporary custody orders entered as a part of a dissolution proceeding.

> As the court of appeals correctly noted, excluding one party from the other's residence, one of the expressly included forms of temporary relief under subdivision 7(a), functionally requires control of physical custody of the children for the duration of the order.

*Baker v. Baker*, 481 N.W.2d at 874.

However, the court of appeals went on to conclude that statutory provisions which govern the issuance of temporary restraining orders in dissolution proceedings also control in the domestic abuse setting. Specifically, the court applied the stringent requirements of Minn.Stat. § 518.131, subd. 3(b) to the temporary custody provisions of the order for protection entered in this case. That section provides that no *ex parte* order may grant custody of minor children to "either party except upon a finding by the court of immediate danger of physical harm" to the children.

While the provisions of the Domestic Abuse Act that allow *ex parte* orders do not specifically address custody (or visitation), Minn.Stat. § 518B.01, subd. 7(a) does authorize "relief as the court deems proper." There is an obvious practical need to deal with custody issues when one parent is excluded from the home.

Moreover, other sections of the Domestic Abuse Act do contain adequate guidance for the court in determining custody and visitation issues. In the section authorizing relief after notice and opportunity for hearing, the court is directed to

> award temporary custody or establish temporary visitation with regard to minor children of the parties on a basis which gives *primary consideration to the safety of the victim and children.*

Minn.Stat. § 518B.01, subd. 6(a)(3) (emphasis added). Nothing in the statute or its history suggests that this same standard should not apply to the custody determinations at the *ex parte* stage, nor that the standard of the dissolution statute should apply. Indeed, the court of appeals has apparently overlooked the 1985 amendments to the Domestic Abuse Act which specifically repealed the reference to the dissolution statute's custody standards.[10]

Accordingly, we hold that determinations of custody and visitation made at the time of the issuance of an *ex parte* order for protection are governed by Minn.Stat. § 518B.01, subd. 6(a)(3), giving primary consideration to the safety of the victim and the children.

## III.

■ Finally, we turn to the question of whether the court of appeals erred in remanding the subsequent order for protection to the trial court for findings on custody consistent with Minn.Stat. § 257.025(a), requiring a detailed "best interests" analysis. This is perhaps the most troubling issue in this case.[11]

While the Domestic Abuse Act does provide a standard for making custody and visitation determinations, it is essentially silent on the level of findings necessary. However, it is a significant leap to con-

---

the possibility of children repeating those patterns); *State ex rel. Williams v. Marsh,* 626 S.W.2d 223, 232 (Mo.1982) (finding the means reasonable, the goal legitimate, and safeguards adequate, along with the need for prompt action); *Blazel v. Bradley,* 698 F.Supp. 756, 768 (W.D.Wisc.1988) (finding statute constitutional that allowed *ex parte* temporary restraining order to issue); *but see Deacon v. Landers,* 68 Ohio App.3d 26, 587 N.E.2d 395 (1990) (The petitioner's due process rights were violated when a mutual order for protection was issued at the end of the hearing scheduled, upon oral

request of the respondent, without any testimony presented in support).

**10.** *See* Domestic Abuse Act, ch. 195, sec. 2, 1985 Minn.Laws 608.

**11.** We note that the 1992 legislature amended Minn.Stat. § 518B.01, subd. 6(a)(3) to provide that:

> Except for cases in which custody is contested, findings under Minn.Stat. sec. 257.025, 518.17 or 518.175 are not required.

clude, as the court of appeals has done, that Minn.Stat. § 257.025(a) controls. First, as appellant argues, that provision is directed to custody determinations in contexts other than domestic abuse. Requiring conformity to its provisions would, in the guise of a discussion on findings, substitute the "best interests" standard in lieu of the "safety of the victim and child" standard of the Domestic Abuse Act. Custody orders in this setting are intended to be temporary and generally either expire or are reviewed by the court one year from their issuance. Minn.Stat. § 518B.01, subd. 6(b).

Furthermore, the hearing at which such custody determinations are to be made must be held no later than seven days from the issuance of any *ex parte* order, except in limited circumstances. Minn.Stat. § 518B.01, subd. 7(b). This is a wholly inadequate time for the parties to prepare testimony and other evidence in support of a best interests analysis, or for county personnel to conduct custody evaluations to assist the court. Thus, the effect of the court of appeals ruling is to force trial courts into making findings on a completely inadequate record, to delay order for protection hearings beyond statutory deadlines or to confound the practical need to make custody determinations. We do not believe this could be the legislature's intent.

The statute itself provides guidance in this regard. The final sentence of Minn. Stat. § 518B.01, subd. 6(a)(3) reads:

> The court's deliberations under this subdivision shall in no way delay the issuance of an order for protection granting other reliefs * * *.

We believe that manifests the legislature's concern that the proper workings of the Domestic Abuse Act not be inappropriately delayed. We are directed to presume that the legislature does not intend a result that is impossible of execution. Minn.Stat. § 645.17(1) (1990). Because the application of a § 257.025(a) "best interests" analysis is impossible to execute in the context of a hearing on a domestic abuse order for protection, we hold that it does not apply here.

This conclusion is bolstered by our most recent consideration of related issues in *Vogt v. Vogt,* 455 N.W.2d 471 (Minn.1990). There we said:

> The law is expected to provide immediate temporary relief, yet time for courts to decide a case fairly and thoughtfully is often in short supply. * * * The trial court has wide discretion in dealing with these matters. Ordinarily, consideration of any affidavits and some brief questioning of parties will suffice for issuance of an order for temporary relief; the order is of course subject to revision if more information subsequently comes to light. Or Court Services can conduct an abbreviated preliminary investigation, at least interviewing the parties, sorting out their respective positions and making recommendations to aid the court in arriving at its decision.

*Vogt,* at 475. Obviously, this "abbreviated," "brief" and "preliminary" approach will not suffice if the detailed findings of the "best interests" analysis are required.

Therefore, we hold that oral findings consistent with the "safety" standard of Minn.Stat. § 518B.01, subd. 6(a)(3) will support a custody determination pursuant to that provision.

Reversed.