Appellants executed an affidavit on March 5, 1955, consenting to commit their son Terry to the temporary custody of the executive secretary of the Hennepin County Welfare Board, and a petition alleging him to be dependent and neglected was filed in the juvenile court of said county on March 10, 1955. After hearing, an order was issued for temporary custody. On March 29, 1956, a petition was filed alleging Terry Harlow, Sharri Faith, and Janice Beth Klugman to be dependent and neglected children. At a hearing on April 24, 1956, the juvenile court found them to be dependent and neglected children and awarded temporary custody to the Hennepin County Welfare Board for a period of 6 months. This temporary custody was continued on October 16, 1956, for a period of 3 months and again on January 15, 1957, until March 8, 1957. At the end of the last continuance, a final hearing was had pursuant to which the court entered its order committing all of the children to the general guardianship of the commissioner of public welfare. After their motion for amended findings or in the alternative for a new hearing was denied, Jack and Irene Klugman, the parents of said children, appealed to this court under M.S.A.605.09(3, 4).
Jack and Irene Klugman are 44 and 32 years of age respectively. Jack Klugman served in the United States armed forces during World War II, at which time he sustained wounds causing disability from shrapnel which lodged in the region of his heart. Jack and Irene were married shortly after the end of the war. About that time it was discovered that Jack was suffering from a valvular heart condition which tended to invalid him increasingly from time to time, necessitating his submission to heart surgery in late 1955 at the Veterans Hospital in Minneapolis. He was discharged from the hospital a few days prior to the hearing held in juvenile court on April 24, 1956. *Page 116 
Terry was born to the Klugmans on December 2, 1947; Sharri on February 17, 1950; and Janice on January 16, 1952. All were born by Caesarian delivery. It appears that from 1948 until April 1956, the father was unable to seek and retain gainful employment of any kind due to his heart condition and resulting disability. The income of the appellants became limited to such compensation as he received from the United States government by reason of his service-connected disability. During this period, the family accrued unpaid bills in substantial amounts due to long periods of unemployment and the surgery which led to his gradual recovery.
The record indicates that Mrs. Klugman first sought and obtained aid from the Jewish Family and Children's Service at Minneapolis in 1949, and again in the fall of 1953, because of difficulty with the oldest child in performing his school work. On recommendation of the agency, and with the consent of the appellants, Terry was sent to the Washburn Memorial Clinic for diagnostic study and found to be somewhat emotionally disturbed. He was thereafter transferred from a public school to a parochial school. In January 1955, on recommendation of the agency and with appellants' consent, Terry was admitted to the University Hospitals for extensive diagnostic study with the same finding. Thereafter, on recommendation of the doctors at the University Hospitals and with the consent of the appellants, the proceedings were instituted in the juvenile court for Hennepin County in 1955. It appears that the sole purpose of this proceeding was to enable Terry to be committed to the Minnesota Children's Center at St. Paul for the purpose of receiving psychiatric care and treatment, which his condition appeared to require, and also to enable the Hennepin County Welfare Board to bear the expense of such care and treatment. Terry remained at this center until December 1955 and it appears that his condition became improved. During the same year it was discovered that Sharri had an I. Q. of 61 and lacked capacity to cooperate with her nursery school teachers and to play with other children of her age. On December 16, 1955, the youngest child Janice had her stomach lavaged at the General Hospital following her ingesting aspirin given to her by her sister Sharri, and the same treatment had to be given to Sharri for somewhat similar reasons. *Page 117 
It further appears that during 1955 quarrels between appellants created difficulty in their marriage relation and finally resulted in a separation in October 1955. Irene instituted a divorce proceeding in the Hennepin County District Court which was later dismissed and a reconciliation effected. It appears that during this period Irene became careless in her conduct, had some unfortunate difficulties, and as a result became subject to criticism on that account. The record indicates that those faults have since been corrected and that appellants have resumed a normal husband-wife relationship. Jack has gradually improved after heart surgery to the extent that he is only required to go to the hospital for annual checkups and as a result is regularly employed and has been able to increase his income — when added to his service-connected disability pay — to anywhere from $260 to $300 per month. Appellants have purchased and occupy a house for residential purposes which has a large yard and is equipped with swings and other playground equipment. They have gradually reduced their outstanding indebtedness. They have established a pleasant home life and Jack's employment is continuous and regular with the same employer. It also appears that a brother-in-law has offered to turn over to Jack a certain business producing a possible income of $100 to $125 per month which would only require a short period daily for its operation.
The financial condition of the appellants would appear now to have improved sufficiently to justify its being removed as an issue from these proceedings. Appellants ought to be able to take care of and support their children as their income now stands without aid from any agency or welfare board. In fact the record discloses that Mr. B. Robert Berg, supervisor of the children's department of the Jewish Family and Children's Service, stated at the hearing on March 8, 1957, that finances were not at the time an important part of the situation in which this family finds itself. This situation hardly supports the issue in the petitions originally, the petition of March 29, 1956, having stated that appellants neglected and failed to provide a suitable home for the children. That situation did not exist on March 8, 1957. At that time the evidence fairly established that Jack and Irene were enjoying a happy harmonious marriage and that whatever difficulties had occurred *Page 118 
during the period of the separation had been overcome and a complete reformation largely effected.
It appears that Irene had on several occasions taken care of the children of Mr. Brodsky, a brother-in-law, the same relative who in 1955 had expressed concern about the Klugman children to the Jewish Family and Children's Service and the evidence is that she did it during different periods in a satisfactory manner. It also appears that the new relationship that seems to have been established between the appellants after they overcame their difficulties and after the heart surgery had improved Jack's physical condition to the extent disclosed by the record is in sharp contrast to their relationship prior to April 1956 when their income had been depleted due to Jack's continued hospitalization and the children posing a problem for Irene under all the circumstances then existing.
The questions involved on this appeal appear to be whether the Klugman children were dependent and neglected children in March 1957, at the time of the final hearing.
1-2-3-4. Laws which permit the severance of the tie that binds a parent to a child recognize the sacredness of that tie and extend the hope of reunion. State ex rel. Hilbert v. Probate Court, 150 Minn. 16, 184 N.W. 27. We think the authorities in this state on the subject of dependent and neglected children indicate that the statutes ought to receive a liberal construction, not only as regards the best interests of the child, but also as regards restoration when the parent or parents reasonably prove that they are both able and willing to love, support, care for, and educate their children. This court has repeatedly held that the right of a parent to custody of their child is paramount and either parent is presumed to be a fit and suitable person to be entrusted with care of child or children born to and belonging to them. The burden of disproving this presumption rests upon those who challenge it. In other words, the presumption is that the parent is a fit and suitable person to be entrusted with the care of his child, and the burden is upon him who asserts the contrary to prove it by satisfactory evidence. We have recently said that in order to justify depriving a parent of the custody of a child in favor of third persons, there must be a grave reason growing out of neglect, abandonment, incapacity, moral delinquency, *Page 119 
instability of character, or inability to furnish the child with needed care.[1]
5. M.S.A. 260.01 covers the subject of what is meant by a dependent or neglected child. By virtue of § 260.11 a dependent child may not be taken from the parents without their consent, unless diligent effort has been made to avoid such separation, and unless found needful to prevent serious detriment to the welfare of the child.[2] The record *Page 120 
indicates that significant improvement had been made on the part of both appellants as parents during the year 1956 and up to and including March 8, 1957, in the matter of arranging for satisfactory care and supervision of their children, supplemented by adequate income and steadily improved earning capacity. See, In re Booth, 253 Minn. 395, 91 N.W.2d 921, as regards the impact of improvement in conditions on the part of a parent.
6. When the best interests of the child are considered under our statutes providing for aid to neglected and dependent children, and also under the well-settled law in this state that natural parents have the first right to care and custody of their children unless the best interests of the child require it to be given into the hands of someone else, "best interests" does not mean that the child may have an easier or more luxurious life and greater prospect of inheritance with others than with the natural parents. If in the parents there is such a lack of moral stamina or ability to gain a livelihood that it appears that the child must go without proper education and moral training or suffer want under their care and custody, then the best interests of the child are at stake. Mere poverty, however, of the parents is seldom, if ever, a sufficient ground for depriving them of the natural right to the custody of their child or children, to say nothing of the statutory right.
7. By virtue of the provisions of § 260.11, we do not think that under the evidence submitted in the instant case and the authorities cited that the record presents sufficiently grave and weighty reasons to support the court's commission of appellants' children to the general guardianship of respondent. That the children of appellants were neglected and dependent on March 8, 1957, lacks support in the record and the evidence fails to overcome the presumption that these parents are fit to have the custody of their children under the significant improvement *Page 121 
of their home conditions generally as of March 8, 1957. In State ex rel. Platzer v. Beardsley, 149 Minn. 435, 438,183 N.W. 956, 957, this court in considering the rights of a respondent, a mother of a female child born out of wedlock, said:
"* * * It does appear that on April 30, when the mother consented to part with her child, she was destitute. It also appeared from the allegations in the return that she has no suitable home or place where she can keep her child and that she is without means to support it. There is no showing that this condition will continue. Appellants assert that the law presumes that a condition once shown to exist will continue until the contrary is made to appear. Granting that this is so, we are unwilling to dispose of a child solely on the strength of a rule of evidence. There is nothing to show that respondent is unable or unwilling to work and earn enough to support herself and her child. We do not know whether she has relatives or friends able and willing to help her, or where or how she lives. In short, we are left wholly in the dark as to matters of vital importance in determining whether she should be deprived of her natural right to her child. The ties by which mother and child are bound together should not be severed except for grave and weighty reasons. The fact that this child may receive, at the hands of appellants, a better home than respondent can provide, is not a sufficient reason for depriving her of her offspring. * * * The mere fact that a mother is so destitute or impoverished that she cannot adequately provide for the needs of her child and that someone else is willing to take it and give it better educational and material advantages, does not justify the court in transferring its custody." See, State ex rel. Renning v. Armstrong,141 Minn. 47, 169 N.W. 249.
The court made it clear in the Platzer case that the mere fact that a mother is so destitute or impoverished that she cannot, as generously as someone else, provide for the needs of her child and that someone else is willing to take it and give it better educational and material advantages does not justify the court in transferring its custody. If we apply the aforesaid rule to the situation in the instant case, with the present home surroundings of the appellants and their monthly income and earning capacity, grave and weighty reasons are lacking to deprive them of their children. *Page 122 
In view of the background of Jack Klugman's difficulties — that he received nearly a mortal wound when defending his country and had long and tedious hospitalization and serious surgery — it does appear to be harsh treatment to thus deprive him of his children in the face of his most apparent interest in them and the many improvements financially and otherwise brought about in the face of most trying circumstances. The same may be said of the mother when thought is taken of the travail which the record shows she had to endure in bringing the Klugman children into the world. There ought to be a liberal construction here, and the appellants as the natural parents, protected by inherent rights as citizens, ought on the basis of this record with their showing of marked improvement and their professed love for their children to have an open chance to love, rear, care for, and educate them.
Much has been made of the past emotional disturbances of the oldest child. The record indicates that when he is with his parents or his grandparents or his uncles and aunts he expresses a desire to return to live at his home with his parents, but that when social workers and placement home mothers keep him and talk to him he expresses a desire never to return to live with his parents. Which ought first and normally to have the greatest impact, what he says to the many of his flesh and blood and his religion, or what he says to strangers whom he may seek to placate? The only explanation for such conduct, and the record would indicate that the welfare agency workers agree on this hypothesis, is that Terry, in seeking love and affection, tells to the person with whom he may be speaking that which he believes such person wishes to hear. The rule of law governing the consideration to be given the wishes of a child in determining his future custody is stated in 67 C. J. S., Parent and Child, § 12c, as follows:
"The preference of a child who is of sufficient age to exercise discretion in choosing its custodian is entitled to considerable weight, especially where the dispute is between the parents or between third persons, but it is not controlling. * * * Where the child is too young to choose with discretion, its preferences have little or no weight, and in any event the welfare of the child is a consideration paramount to its preference. *Page 123 
"* * * There is no fixed age which gives a child capacity to make a choice; it depends on the extent of mental development."
Also, see 39 Am. Jur., Parent and Child, § 21, where the rule is stated in part as follows:
"* * * Until the infant arrives at the age of discretion, its wishes are neither considered nor consulted. At common law the wishes of a child would not be considered if, in the case of a boy, the child was below the age of fourteen, or, in the case of a girl, below the age of sixteen."[3]
This court has in several instances recognized that the reasons which would deprive the natural parents of the right to the care and custody of their child or children must be real, cogent, strong, powerful, serious, as well as satisfactory and grave. In several instances this court has quoted with approval the following statement taken from the decision of the Supreme Court of Wisconsin in Lacher v. Venus, 177 Wis. 558, 569,188 N.W. 613, 617, 24 A.L.R. 403, 409:
"A natural affection between the parents and offspring, though it may be naught but a refined animal instinct * * * has always been recognized as an inherent, natural right, for the protection of which, just as much as for the protection of the rights of the individual to life, liberty, and the pursuit of happiness, our government is formed. We trust that it will never become the established doctrine that the state shall say to the parents, and particularly to the mother, she who doth travail, and in great pain bring forth her child and after labor doth rejoice that the child is born, that there is but a mere privilege and not a right to the subsequent affection, comfort, and pride of and in such child." See, In re Adoption of Kure, 197 Minn. 234, 236, 266 N.W. 746, 747.
We do not think the changing attitudes of the child, Terry, under all the circumstances disclosed ought to be given any more than moderate and passing consideration.
A psychiatrist was called to testify in behalf of respondents and another to testify on behalf of appellants. Each side can claim support *Page 124 
in the expert opinion of the doctor which it called. When the psychiatric testimony is weighed as a whole and the opinions of the doctors balanced one against the other, its weight is not sufficient to overcome the burden placed upon the respondents to satisfactorily prove the separation needful to prevent serious detriment to the welfare of the Klugman children.
Since it is too well settled to require further citations that the right of a parent to the custody of a child is paramount or superior to that of any other person; that the parent is presumed to be a fit and suitable person to be entrusted with the care of the child; and that the burden of disproving this presumption rests upon the person challenging it, and since it is provided by M.S.A. 260.11 that "In no case shall a dependent child be taken from its parents without their consent unless, after diligent effort has been made to avoid such separation, the same shall be found needful in order to prevent serious detriment to the welfare of such child," we feel compelled to reach the conclusion, under well-established principles of evidence, that under the facts as shown in the record on this appeal, respondents have not satisfactorily sustained the burden of establishing neglect and dependency. We therefore reverse with directions to vacate the order appealed from and to restore the persons and custody of the Klugman children to their parents.
Reversed with directions.
[1] See, In re Baby Girl Larson, 252 Minn. 490, 91 N.W.2d 448; State ex rel. Nelson v. Whaley, 246 Minn. 535,75 N.W.2d 786; Kienlen v. Kienlen, 227 Minn. 137, 34 N.W.2d 351; State ex rel. Merritt v. Eldred, 225 Minn. 72, 29 N.W.2d 479; State ex rel. Peterson v. Sanders, 215 Minn. 502,10 N.W.2d 387; State ex rel. Olson v. Sorenson, 208 Minn. 226,293 N.W. 241; State ex rel. Vik v. Sivertson, 194 Minn. 380,260 N.W. 522; State ex rel. Feeley v. Williams, 176 Minn. 193,222 N.W. 927; State ex rel. Fossen v. Hitman, 164 Minn. 373,205 N.W. 267; State ex rel. Mattes v. Peterson, 156 Minn. 178,194 N.W. 326; State ex rel. Machgan v. Pelowski, 145 Minn. 383,177 N.W. 627; State ex rel. Larson v. Halverson, 127 Minn. 387,149 N.W. 664; State ex rel. Lehman v. Martin, 95 Minn. 121,103 N.W. 888; State ex rel. Anderson v. Anderson, 89 Minn. 198,94 N.W. 681; In re Adoption of Anderson, 189 Minn. 85, 248 N.W. 657.
[2] Section 260.01 provides as follows:
"For the purpose of sections 260.01 to 260.34 the term 'dependent child' means a child who is illegitimate; or whose parents, for good cause, desire to be relieved of his care and custody; or who is without a parent or lawful guardian able to adequately provide for his support, training, and education, and is unable to maintain himself by lawful employment, except such children as are herein defined as 'neglected' or 'delinquent.' The term 'neglected child' means a child who is abandoned by both parents, or if one parent is dead, by the survivor, or by his guardian; or who is found living with vicious or disreputable persons, or whose home, by reason of improvidence, neglect, cruelty, or depravity on the part of the parents, guardian, or other person in whose care he may be, is an unfit place for such child; or whose parents or guardian neglect and refuse, when able to do so, to provide medical, surgical, or other remedial care necessary for his health or well-being; * * *."
Section 260.33 reads as follows:
"Sections 260.01 to 260.34 shall be liberally construed to the end that their purpose may be carried out. In all proceedings arising under their provisions the court shall act upon the principle that to the child concerned there is due from the state the protection and correction which he needs under the circumstances disclosed in the case; and when it is necessary to provide for him elsewhere than with his parents his care, custody, and discipline shall approximate as nearly as may be that which ought to be given by his parents; and in all cases where it can properly be done he shall be placed in an approved family home and become a member of the family by legal adoption or otherwise."
[3] Also see, 31 Am. Jur., Juvenile Courts, § 75. *Page 125