In the Matter of the WELFARE OF
Richard KIDD.

No. 47439.

Supreme Court of Minnesota.

Jan. 6, 1978.

William R. Kennedy, County Public Defender, Gerard W. Snell and Warren R.

Sagstuen, Asst. Public Defenders, Minneapolis, for appellant.

Warren Spannaus, Atty. Gen., Gary W. Flakne, County Atty., Vernon E. Bergstrom, Chief, Appellate Division, David W. Larson, Phebe S. Haugen, and Lee W. Barry, Asst. County Attys., Minneapolis, for respondent.

TODD, Justice.

Diane Kidd, wife of Robert Kidd, gave birth to Richard Kidd on January 10, 1976. At that time, Diane was diagnosed as a chronic schizophrenic psychotic with a history of 17 years of treatment. The child was placed in a foster home. Robert Kidd consented to termination of his parental rights, but Diane contested such action. The trial court adopted the recommendation of the juvenile court referee and terminated Diane's parental rights. We affirm.

The findings of fact of the trial court adequately summarize the necessary facts in this case. They state:

"1. Said child, Richard Kidd, was born legitimately January 10th, 1976, to Diane Sjoquist Kidd and her husband, Robert Kidd, both residents of 907 Aldrich Avenue North, Minneapolis, Hennepin County, Minnesota.

"2. That said Diane Sjoquist Kidd suffers from a mental illness of more than seventeen years' duration; that said mental illness is schizophrenia, chronic undifferentiated type. That she has been hospitalized at least eleven times without any remissions of her illness occurring during said seventeen years, although she had competent medical treatment during said time.

"3. That said mother is unfit by reason of conduct occurring by reason of her mental illness which the Court finds likely to be detrimental to the physical or mental health or morals of said child, the following being examples of such conduct arising because of her mental illness:

"(a) That said child was born in a snowbank and that the mother was unconcerned about giving birth to a child in that situation and also was unconcerned about receiving no prenatal cares, giving unrealistic reasons for both.

"(b) Shortly after the baby's birth, while the baby was still in an isolet in the hospital, the mother placed beads around the neck and torso which caused the baby to struggle and also created a potential hazard to the baby.

"(c) That when the child was still in the hospital and less than two weeks old, the mother brought a box of animal crackers to feed to the baby which would constitute a serious danger of the child choking.

"(d) Even after nurses at the hospital attempted to teach the mother parenting skills, mother remains incapable of feeding and caring for her baby, and she is also incapable of employment due to her mental illness.

"(e) On May 26, 1976, and again on July 15, 1976, when the mother was visiting the child in the foster home, the mother placed her mouth on the child's penis until stopped by case worker and foster mother of the child, at both times the mother explaining that she did that to help the child's breathing.

"(f) That on another occasion when the mother was visiting the child in the foster home and the temperature was actually about seventy-five degrees, the mother attempted to dress the child for winter weather; that is, in a scarf and blanket.

"(g) If the mother were not living with her husband who is caring for her, she would require nursing care or at a minimum board and care home.

"(h) The mother is unable to distinguish between her hallucinatory world and the actual care required by the child, and her interaction with the baby is inappropriate and oftentimes dangerous to him.

"4. That no element of blame of malice can be placed on the mother, who loves her child, desires to have her child with her, and that she has visited her child when allowed to do so and would have liked to visit her child more frequently.

"5. That the only goal that could be set if custody were given under a neglect finding would be recovery from the mental illness; and, in view of the history of the seventeen years' mental illness without remission, this seems futile. To delay termination under the circumstances might further deprive the child.

"6. That the father has recognized at an early stage his inability to care for the child and has essentially abandoned the child by failing to visit and has not supported the child; and when the Court announced what the determination would be as to the mother, said that he filed his written consent to a termination of his parental rights for good cause."

Based on these facts, the trial court entered the following conclusions of law:

"7. The mother, Diane Sjoquist Kidd, is unfit by reason of conduct arising solely from her mental illness, which conduct is found by the Court to be likely to be detrimental to the physical or mental health or morals of the child.

"8. The father, Robert Kidd, for a good cause requests his parental rights to be terminated and has consented in writing, which consent is so filed with the Clerk of this Court."

The issue presented is whether Diane Kidd is unfit by reason of conduct arising from her mental illness so as to provide a basis for terminating her parental rights pursuant to Minnesota statute. The statutory grounds for termination of parental rights are Minn.St. 260.221, which provides in part:

"The juvenile court may, upon petition, terminate all rights of parents to a child in the following cases:

* * * * * *

"(b) If it finds that one or more of the following conditions exist:

* * * * * *

"(4) That the parents are unfit by reason of debauchery, intoxication or habitual use of narcotic drugs, or repeated lewd and lascivious behavior, *or other conduct* found by the court to be likely to be detrimental to the physical or mental health or morals of the child; * * *." (Italics supplied.)

At issue in this case is the construction of the term "other conduct" as used in the statute. At the outset, we wish to state unequivocally that mental illness in and of itself shall not be classified as "other conduct" which will permit termination of parental rights. Rather, in each case, the actual conduct of the parent is to be evaluated to determine his or her fitness to maintain the parental relationship with the child in question so as to not be detrimental to the child. Also, this court will continue to exercise great caution in termination proceedings, finding such action proper only when the evidence clearly mandates such a result in accordance with the statutory grounds.

While we have not had the occasion to review a determination similar to that presented, our analysis in *In re Welfare of Forrest,* Minn., 246 N.W.2d 854 (1976), is applicable. In *Forrest,* we reviewed the refusal of the district court to terminate the parental rights of the father where the court specifically found that the father was not presently able to meet the needs of the child. The father was an alcoholic who had remained sober for a period of 13 months so as to correct the initial cause of the child's dependency. We held that the district court's findings were unclear on the crucial issue of whether the father will be able to provide proper care for the child and become a suitable custodial parent. The case was remanded for the taking of additional evidence in this regard. This court then noted as follows (Minn., 246 N.W.2d 857):

"If on remand the district court concludes that, while Donald has regained sobriety, he remains permanently unable to care for his daughter, then in our view the best interests of Terri require that Donald's parental rights be terminated so that the Runnings may adopt Terri and establish lasting bonds of affection with her, and provide the type of stable home life which would surely be most beneficial to her. If, on the other hand, the evidence indicates that Donald's rehabilitation and living circumstances are such that he is, or within a forseeable time will

be, able to provide the type of care which a young girl of Terri's age requires, then the district court should decline to terminate Donald's parental rights and should establish a supervised plan whereby custody of Terri can gradually be transferred from the Runnings to Donald with whatever counseling and assistance may be appropriate."

At that time, we expressed an intent to rely to a great extent upon the projected permanency of the parent's inability to care for his or her child.

In the instant matter, the record exhibits appellant's inability to recognize the needs and limitations of the infant, her ineptness with regard to the mechanical functions of a parent, and her bizarre and potentially dangerous conduct stemming from her mental illness. Also of record is unrefuted testimony of Dr. Martin Orbuch who, having had contact with appellant for substantially the duration of her illness, opined that the long-term prognosis was poor and noted that her condition had remained stable, without remission, for at least 10 to 15 years. This is in the nature of the finding we sought in the *Forrest* case.

Appellant mistakenly argues that the evidence is insufficient as a matter of law to support the § 260.221(b)(4) finding inasmuch as there is no positive showing of harm to the infant. However, that statutory provision does not require a showing that harm has resulted to the infant child, but only that other conduct of the parent is likely to be detrimental to the physical or mental health of the child.

The second contention of appellant is that her present inability to care for the child, based solely upon her mental illness, is not a ground for termination. She suggests that she is content for the present to allow the child to remain in the foster home. The record, however, established not only that her condition resulted in a present inability to care for her child, but also that its projected duration would result in the permanent inability as discussed in *Forrest*. Further, such a situation precludes the establishment of parental bonds with the child by either the natural parent or adoptive parents within the foreseeable future which we regard as detrimental to the best interests of the child.

We therefore conclude that there is substantial evidence to support the determination that appellant's demonstrated behavior stemming from a projected permanent mental condition is "other conduct" likely to be detrimental to the health and welfare of the child within the meaning of § 260.-221(b)(4), and that, therefore, termination of her parental rights was proper. However, we reiterate that a mental illness alone cannot serve as the basis for termination and that this court will continue to review each matter upon its specific facts to determine whether statutory grounds for termination exist.

Affirmed.

OTIS, J., took no part in the consideration or decision of this case.