290 N.W.2d 766 (1980)
In the Matter of the WELFARE OF Anthony Fred CHOSA.
RAMSEY COUNTY WELFARE DEPARTMENT, petitioner, Respondent,
v.
Bruce BECK, guardian ad litem, Respondent,
Peggy Ann Chosa, Appellant.
No. 50234.
Supreme Court of Minnesota.
March 14, 1980.
*767 Roedler, Bellows & Hughes and George R. Roedler, Jr., St. Paul, for appellant.
Thomas W. Foley, County Atty., and Steven C. DeCoster, Asst. County Atty., St. Paul, for Ramsey County Welfare Dept.
Bruce L. Beck, St. Paul, for the Child.
Heard before TODD, YETKA, and SCOTT, JJ., and considered and decided by the court en banc.
TODD, Justice.
Anthony Fred Chosa was born January 27, 1976. His mother, Peggy Ann Chosa, is an unmarried American Indian who was 15 years old at the time of his birth. The parental rights of Peggy and the father were terminated on March 6, 1979. Peggy has appealed. We reverse and remand for further proceedings.
During most of the year and a quarter between Anthony's birth and April 14, 1977, when he was adjudicated dependent and neglected, Anthony lived with Peggy and his aunt, Peggy's sister, in the aunt's home. This arrangement continued for a month and a half after the adjudication. At that time, Peggy displayed signs of chemical dependency and underwent a series of placements for evaluation and treatment. None of the placements proved successful, however, because Peggy was uncooperative and ran away on numerous occasions.
In October 1977, Peggy was picked up by the police while lying intoxicated on a sidewalk and was ordered by juvenile court to enter the chemical dependency treatment program at the Hastings State Hospital. She left this program on November 13 despite medical advice and the order of the court that she remain. Peggy was apprehended, *768 and on November 21 the court placed her in the United Indian Group Home (Indian Home). Six days later, she ran away for approximately 2 months. On January 29, 1978, Peggy turned herself in to police and was ordered returned to the Indian Home by the court.
On February 1, 1978, Peggy was told for the first time by her caseworker that she risked having her parental rights terminated if her conduct did not improve. From that time until October 1978, Peggy began to make some progress in regulating her lifestyle. Although she did make occasional 2 or 3-day runs, she ceased making extended runs away from treatment. Although she spent the money she earned on herself instead of Anthony, she held a job for a while and passed two of five tests toward a General Educational Development Degree. Although she remained uncommunicative to most people, she made some friends at the Indian Home. Also, while at the Indian Home, Peggy had been encouraged to take the parenting classes in which her caseworker had promised to enroll her but which she had missed because of her frequent and lengthy runs from treatment prior to 1978. Unfortunately, no parenting classes were available at the Indian Home and none were created for Peggy's benefit.
On September 29, 1978, Peggy became 18 and shortly thereafter left the Indian Home because it was not programmed to care for adults. She lived with her brother until February 1979, when special arrangements were made at Peggy's request for her to return to the Indian Home.
The Ramsey County Welfare Department filed a petition to terminate parental rights on November 7, 1978. A hearing was held on March 5, 1979, at which Peggy appeared and was represented by counsel. The father did not appear, and his rights were terminated. At this hearing, the welfare department introduced evidence that during the period of time between the dependency proceedings and the termination proceedings Peggy had visited Anthony only 3 or 4 times. The evidence disclosed that various persons seeking to assist and counsel her had urged her to visit Anthony, even furnishing her bus fare for transportation, but she evidenced no interest in visitation. Peggy attributes this conduct to her shy, uncommunicative personality and the fact that she felt intimidated when visiting her sister's home and the white foster home where Anthony was being cared for.
On the day of the hearing, Peggy's counsel produced Dr. Norman Silberberg as a surprise witness. Dr. Silberberg presented a previously untried plan for a 90-day reuniting of Peggy and Anthony in a supervised live-in program of parenting classes which would provide the opportunity for a more accurate evaluation of Peggy's parenting skills. The court denied a motion for a continuance to try the plan because of its concern over the lateness of the proposal, the admittedly limited prior contact between Dr. Silberberg and Peggy, and the fact that Anthony was becoming older and thus less amenable to placement. At the hearing, the welfare department explained its plan to have Anthony placed with Peggy's sister for eventual adoption if the sister could successfully complete treatment for her alcoholic problems. Also, Peggy declared she was pregnant but planned to place this child for adoption. On March 6, the court terminated Peggy's parental rights and Anthony was placed with his aunt.
At oral argument it was disclosed that Peggy is presently rearing her new baby under supervision of the Hennepin County Welfare Department rather than placing him for adoption, and that Anthony's placement with his aunt has been unsuccessful. Anthony was recently moved to an Indian shelter home where he is awaiting placement with an Indian foster family.
The issues presented are:
(1) Is the evidence sufficient to support the termination order?
(2) Did the trial court abuse its discretion in refusing a continuance?
(3) What effect does the Indian Child Welfare Act of 1978, 25 U.S.C. § 1912 (1978), have on these proceedings?
*769 1. This court has adopted very stringent standards in reviewing orders for termination of parental rights. The burden of proof is upon the petitioner and is subject to the presumption that a natural parent is a fit and suitable person to be entrusted with the care of a child, In re Dependency of Klugman, 256 Minn. 113, 97 N.W.2d 425 (1959). We require that the trial court make clear and specific findings which conform to the statutory requirements for termination adjudications, In re Petition of Zerby, 280 Minn. 514, 160 N.W.2d 255 (1968). We further require that the evidence relating to termination must address conditions that exist at the time of the hearing, that the existence of a neglect order alone cannot be the basis for issuance of a termination order, and that it must appear that the present conditions of neglect will continue for a prolonged, indeterminate period, In re Welfare of Barron, 268 Minn. 48, 127 N.W.2d 702 (1964). Finally, this court, while giving deference to the findings of the trial court, will exercise great caution in termination proceedings, Matter of Welfare of Kidd, 261 N.W.2d 833 (Minn.1978); In the Matter of the Welfare of Clausen, 289 N.W.2d 153 (Minn.1980), filed January 25, 1980.
In exercising our responsibility in this case, we cannot approve the present order of termination. Our decision is admittedly influenced by the disclosures that Peggy is presently caring for her second child and that the proposed plan for Anthony's placement has been ineffective, facts not available to the juvenile court. However, the hearing record also supports our conclusion in this case. Peggy is a young woman, hardly older than a girl, who has displayed a growing maturity during the past year. Peggy's maturity could have been even further developed had she been able to make a schedule for attending the promised parenting classes. Thus, we do not believe that the record supports the conclusion that Peggy's present condition will be prolonged and indeterminate. Under the supervision of the welfare department and with the assistance of child-rearing services, Peggy should be able to demonstrate her ability to care for Anthony just as Dr. Silberberg suggested.
This resolution of the case will not adversely affect Anthony's welfare because further court proceedings could add little more to the disruption of Anthony's life than is presently occurring. However, we do express our desire that the proper authorities carefully monitor the situation and promptly seek termination of Peggy's parental rights again if she is unable to meet the challenge of parenthood.
2. Having determined to vacate the termination order, we need not consider whether the trial court abused its discretion in refusing a continuance of the proceedings.
3. Having determined to vacate the termination order, we need not consider the question of the applicability of the Indian Child Welfare Act of 1978 to this case. We do observe that any further proceedings for termination will be subject to the provisions of the act which require that termination of parental rights of Indian children must be supported by evidence beyond a reasonable doubt, including testimony of qualified expert witnesses, that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child. Public Law 95-608, Title I, § 102(f); 25 U.S.C.A. § 1912(f).
The order of termination is vacated, and the matter remanded to the trial court for proceedings consistent with this opinion.