The TORO COMPANY, Relator,

v.

COMMISSIONER OF ECONOMIC SECURITY, Respondent.

No. C8-84-854.

Court of Appeals of Minnesota.

Oct. 30, 1984.

Timothy R. Quinn, Jeffrey B. Oberman, Doherty, Rumble & Butler, St. Paul, for relator.

Hubert H. Humphrey, III, Atty. Gen., Laura E. Mattson, Sp. Asst. Atty. Gen., St. Paul, for respondent.

Heard, considered and decided by POPO-VICH, C.J., and PARKER and LANSING, JJ.

## OPINION

PARKER, Judge.

This case comes before the court on a writ of certiorari from a decision issued by the Commissioner of Economic Security. The Commissioner ruled that portions of an employee's compensation deposited in an employer's health care expense account plan through salary deduction at the request of the employee are taxable as wages under the Minnesota Employment Services Law. We affirm in part and reverse in part.

## FACTS

Relator, The Toro Company (Toro), established a plan entitled "The Health Care Expense Account" (Plan) for its employees. The Plan is a "cafeteria plan" as defined in I.R.C. § 125(d)(1), which states:

The term "cafeteria plan" means a written plan under which

(A) all participants are employees, and

(B) the participants may choose among two or more benefits.

The benefits which may be chosen may be non-taxable benefits, or cash, property, or other taxable benefits.

Under the Plan employees may elect, in December of each year, to receive their compensation for the upcoming year totally in cash wages or partially in cash wages and partially in health benefits.

In the December election a participating employee designates the amount of compensation to be deposited in the Plan. In the following year Toro establishes individual health care expense accounts for each participating employee. Toro credits the accounts as employees' compensation becomes due throughout the year.

The amounts credited to the account are first applied to pay monthly medical and dental insurance premiums. The deposits may be either equal to or greater than the employee's insurance premium but no more than $100 per month. Employees whose deposits equal their insurance premium end the month with an account balance of zero. Those employees who have elected to maintain an account in excess of the amount needed to pay their insurance premiums may be paid from their account balances for health expenses, such as medical and dental deductibles and co-payments, which are not covered by Toro's health insurance plan. Such payment is available in May and November of each year and will occur only after the employee has submitted proof of payment for the expenses.

The annual election to participate in the Plan is irrevocable for one calendar year. However, employees who elect to have funds contributed to the Plan in excess of those necessary to pay insurance premiums may direct at any time during the year that excess funds should no longer be contributed. Additionally, account balances are payable to employees at the end of the calendar year or upon termination, whichever occurs first. Year-end account balances not exceeding $1,200 may be carried over to the next calendar year.

The Department of Economic Security (Department) notified Toro by letter that the full amount of compensation designated by an employee for deposit in the Plan is reportable as wages under Minn.Stat. § 268.04, subd. 25 (Supp.1983), for purposes of unemployment tax and benefits. After a hearing the Department's referee affirmed the determination. On appeal the Commissioner affirmed the referee's decision. Toro seeks review of the Commissioner's decision.

## ISSUE

Are the portions of an employee's compensation deposited through salary deduction in an employer's health care expense account plan, at the request of the employee, taxable as wages under the Minnesota Employment Services Law?

## DISCUSSION

In an Economic Security case this court's scope of review is limited:

> The narrow standard of review requires that findings be viewed in the light most favorable to the decision, and if there is evidence reasonably tending to sustain them, they will not be disturbed.

*Group Health Plan, Inc. v. Lopez,* 341 N.W.2d 294, 296 (Minn.Ct.App.1983); *see also White v. Metropolitan Medical Center,* 332 N.W.2d 25, 26 (Minn.1983).

The interpretation of Minn.Stat. § 268.04, subd. 25, is a question of law "upon which this court is free to exercise its independent judgment," *see Smith v. Employers' Overload Co.,* 314 N.W.2d 220, 221 (Minn.1981), and "need not defer to agency expertise," *see No Power Line, Inc. v. Minnesota Environmental Quality Council,* 262 N.W.2d 312, 320 (Minn.1977).

"Wages" for purposes of unemployment taxation is defined in Minn.Stat. § 268.04, subd. 25:

> "Wages" means all remuneration for services, including commissions and bonuses, back pay as of the date of payment, and tips and gratuities paid to an employee by a customer of an employer and accounted for by the employee to the employer, and the cash value of all remuneration in any medium other than cash * * *.

However, certain items are excluded by the statute from the definition of wages, including:

> (b) *The amount of any payment made to, or on behalf of, an employee under a plan or system established by an employer which makes provision for his employees generally or for a class or classes of his employees* (including any amount paid by an employer for insurance or annuities, or into a fund, to provide for any such payment), *on account of* (1) retirement or (2) sickness or accident disability or (3) *medical and hospitalization expenses in connection with sickness or accident disability,* or (4) death * * *.

Minn.Stat. § 268.04, subd. 25(b) (Supp.1983) (emphasis added).

Toro contends that the payments for medical and dental insurance premiums and for expenses not covered by insurance under Toro's Plan are medical and hospitalization expenses within the meaning of the exclusion. The Department disagrees. Its primary concern seems to be that the employee, and not Toro, exercises control over the funds contributed to the Plan.

In fact, however, the employee does not control the funds. An employee must elect to participate in the Plan before the upcoming year. Having so elected, the employee may not revoke the election. Toro then establishes a health care expense account

for the employee, deducts a portion of the employee's compensation as it comes due, and deposits that portion in the employee's account. The funds are paid by Toro for medical and dental insurance premiums. If sufficiently documented, Toro will pay the employee with funds from the account for additional health related expenses incurred during the year.

This court recently decided a similar issue in *J.C. Penney Co., Inc. v. Commissioner of Economic Security,* 353 N.W.2d 243 (Minn.Ct.App.1984). In *J.C. Penney* the court was asked to review the Commissioner of Economic Security's determination that "wages" under Minn.Stat. § 268.-04, subd. 25(e) (Supp.1983), includes elective payments of a percentage of the employee's compensation into a savings and profit-sharing retirement plan. As in the present case, the specific issue was whether such payments were made "on behalf of an employee." This court concluded that:

> Because the language, "on behalf of an employee," is clear, we must assume that the legislature intended the language to be given its common and ordinary meaning. *See* Minn.Stat. § 645.08(1) (1982). This interpretation of the statute requires the conclusion that an employee's contributions to a section 401(a) qualified trust are not wages for purposes of the Employment Services Law when the employer deposits those payments at the request of and for the benefit of (i.e., "on behalf of") the employee.

*Id.* at 246–47.

■ The reasoning of *J.C. Penney* also applies in this case, which requires interpretation of the same statutory language (i.e., "on behalf of") in a different subsection of the same statute. The legislature must have intended that its language be interpreted consistently within the same statute. *See Twin Ports Oil Co. v. Pure Oil Co.,* 26 F.Supp. 366, 371 (D.Minn.1939), *aff'd,* 119 F.2d 747 (8th Cir.1941), *cert. denied,* 314 U.S. 644, 62 S.Ct. 84, 86 L.Ed. 516 (1941). Thus, an employee's contributions to Toro's Plan are not wages for purposes of the Employment Services Law when the employer deposits the payments at the request of and for the benefit of the employee.

■ Although *J.C. Penney* dealt with a section 401(a) qualified trust and Toro involves a health plan, the employer funding structure of the two plans is similar. The major difference between the plans appears to be that the latter allows payment of excess contributions to the employee at the end of the year or upon termination. If this excess were not taxable for both income and unemployment tax purposes, the plan would not qualify for the subdivision 25(b) exclusion. However, both sides agreed that this excess is fully taxable and, hence, this feature will not disqualify the Plan from the subdivision 25(b) exclusion.

The Department claims that the excess payment feature of the Plan would disqualify it as a nontaxable benefit under federal law. However, we express no opinion on that issue since it does not control our interpretation of Minnesota law.

We note here that Toro indicated that the purpose of the Plan was not to circumvent the tax laws. The Plan was developed to correct an inequity that existed with the more traditional employer benefit packages. The inequity arose whenever a Toro employee chose not to participate in the company's medical benefit plan. Often this occurred because that person was already covered or received preferable coverage through a benefit plan in which the employee's spouse participated. This resulted in nonparticipating employees receiving less actual compensation from Toro than participating employees. Under the current Plan those employees who do not wish to participate in the medical benefit Plan will receive an offsetting amount in direct compensation. Since there is no question that funds contributed to the more familiar employer medical benefit plan would not be taxable, it does not seem reasonable that the legislature would intend funds contributed to a plan fashioned to serve the same purpose in a more equitable way to be taxable.

such a result. *In Re Welfare of Kidd,* 261 N.W.2d 833 (Minn.1978).

The trial court terminated S.W.'s parental rights pursuant to Minn.Stat. § 260.221, subd. (b)(4) (1982), because it found him to be "totally lacking in an ability to maintain a reasonable father-child relationship." The statute provides that parental rights may be terminated upon a showing:

> That a parent is palpably unfit to be a party to the parent and child relationship because of a consistent pattern of specific conduct before the child or of specific conditions directly relating to the parent and child relationship either of which are determined by the court to be permanently detrimental to the physical or mental health of the child.

■ Alcoholism which interferes with a parent's long-term ability to provide a stable home or to care for a child may justify termination. *In Re Welfare of C.L.L.,* 310 N.W.2d 555 (Minn.1981).

■ The trial court found that the county gave S.W. a chance to prove his ability to maintain a parent/child relationship. However, he rejected county efforts to help him overcome his drinking and to prepare him for his role as a parent. After an initial effort to stop, he began drinking heavily again. He stopped going to chemical dependency counseling sessions and Alcoholics Anonymous meetings. He never completed parenting courses arranged by the county. He never established a home suitable for a child. And, even when he was employed, he never contributed to E.H.'s support. This record supports the trial court's termination of parental rights.

## DECISION

We affirm the trial court's termination of parental rights.

CRIPPEN, Judge (concurring specially).

Although concurring with the decision to terminate appellant's parental rights, I firmly hold the opinion that termination decisions must be reversed in the absence of positive proof that a child's welfare is endangered by critical, chronic parenting failures.

The facts here are sufficient for termination, but singularly because of the father's adamant preference for dangerous associations and living arrangements that destroy any hope for a plan to reunite him with his child.

I cannot subscribe to termination based primarily on the "continued alcoholism" of the father, whether or not that condition relates to his failure to offer parenting for the child. Nor do I believe that termination for that cause is supported by *Matter of Welfare of C.L.L.,* 310 N.W.2d 555 (Minn.1981), cited in the majority opinion. There, as here, the father's disinterest in the needs of his child, not his drinking problem, justified termination.

In itself, problem drinking does not demonstrate harmful parenting. Rarely can one be confident the condition is irreversible. Often, continued social services will be helpful to persons affected by the problem. *See* Minn.Stat. § 260.155, subd. 7(6) (1982).

The evidence here focuses too little on the child, his needs, and his contacts with appellant. Still, the behavior of appellant shows a pattern of indeterminate failure to meet obvious needs of the child for a lasting, intimate parental contact.

The decision here is difficult in light of the unusually rigorous review called for in these cases. Appellate standards are considered "stringent," as noted in the majority opinion. *Welfare of Chosa,* 290 N.W.2d 766, 769 (Minn.1980). Further examination of those standards is important.

Appellate treatment of termination cases is unlike our approach in any other matter. This is so, first, because of the broad scope of review. We are to give "some deference" to the trial court, but are to "closely inquire" whether evidence is sufficient for termination. *Matter of Welfare of Clausen,* 289 N.W.2d 153, 156 (Minn.1980).

We are bound on appeal to exercise "great caution" in termination proceedings. *Matter of Welfare of Kidd,* 261 N.W.2d

833, 835 (Minn.1978). As the majority opinion indicates, the *Kidd* decision permits us to affirm a termination order only when the evidence "clearly mandates" that result.

In addition, the law demands a bias against termination of parental rights. The majority opinion includes reference to a presumption of parental fitness, a concept well-settled in Minnesota law. *See In re Klugman*, 256 Minn. 113, 118, 124, 97 N.W.2d 425, 428, 429, 432 (1959). Further, it is an established judicial discipline to preserve family ties for a child "whenever possible." *In re Barron*, 268 Minn. 48, 53, 127 N.W.2d 702, 706 (1964). See Minn.Stat. § 260.011, subd. 2 (1982) [1].

For decades our Supreme Court has said that the reasons to permanently interfere with care for a child by a parent must be "grave and weighty." *State ex rel. Platzer v. Beardsley*, 149 Minn. 435, 438, 183 N.W. 956, 958 (1921). The reasons must be "real, cogent, strong, powerful, serious, as well as satisfactory and grave." *In re Klugman*, 256 Minn. 113, 123, 97 N.W.2d 425, 431 (1959); *see State ex rel. Nelson v. Whaley*, 246 Minn. 535, 545, 75 N.W.2d 786, 792 (1956).

Reluctance to approve termination is due in great part to serious hazards in assessing evidence about actions of parents and needs of children. To complete a statement of law, those dangers are noted:

Misgivings on the remedy are warranted, foremost, by the danger of smug judgment on the subject of poor parenting. Hence, the Supreme Court announced in *Clausen* the presumption that a continuing parental relationship is in the best interest of the child.[2] The court said:

In a termination proceeding * * * [the petitioner's burden of proof] is subject to the presumption that a natural parent is a fit and suitable person to be entrusted with the care of his child and that it is ordinarily in the best interest of a child to be in the custody of his natural parent. *Clausen*, 289 N.W.2d at 155–56.

Second, there is danger of a punitive approach when termination is based on misconduct of the parent which has no proven bearing on the qualities of parenting. Commonly, provocative but irrelevant evidence filters into the record. Here, for example, the record tells us the child was conceived in a contract prohibited by a judicial order. We are required to judge whether termination is clearly mandated by competent evidence.

Third, erroneous results are invited when the shield of social services becomes a sword. The Minnesota Legislature and the Supreme Court insist that real assistance precedes the judgment to terminate parental rights. Minn.Stat. § 260.155, subd. 7(2), (5), (6), (7). *See Klugman*, 256 Minn. at 119, 124, 97 N.W.2d at 429, 432; and *Matter of Welfare of HGB*, 306 N.W.2d 821, 826–27 (Minn.1981). Assistance from public agencies is easily transformed, not always noticeably, to a testing approach aimed at demonstrating parental failures. We are bound to closely scrutinize the integrity of public service efforts.

Fourth, information from neither the sciences nor the law provides much assistance in predicting whether parental misconduct will be prolonged and indeterminate. This is particularly evident when dealing with the behavior of those who are chemically dependent. Appellate courts commonly learn of changed, improved circumstances

---

1. See Footnote 2.

2. Further, aversion to severance of family ties is consistent with vital, vigorous public intervention in family affairs for child protection purposes. Child protection purposes and concern for family ties and parental custody are stated alongside one another in the Minnesota Juvenile Court Act. Minn.Stat. § 260.011, subd. 2. *See* Standard Juvenile Court Act, § 1 (1959, National Council on Crime and Delinquency). The

Standard Act is the source of the Minnesota Juvenile Court Act). Comments on § 1 of the Standard Act succinctly state: "The well-established fundamental purpose of courts dealing with the children is to protect them and restore them to society as law-abiding young citizens. * * * [T]he preference in disposition in both the trial and the appellate courts is to keep a child in his home."

of parents arising during the period of appeal, a troubling phenomena that teaches us to heed the mandate for grave cause in termination cases.

Fifth, there is no reason for confidence in judicial decisions about the needs of children. Our Supreme Court noted only last year the inadequacy of judicial determinations on the interests of children and a resulting hesitancy to interfere with a child's relationships. *See Auge v. Auge,* 334 N.W.2d 393, 399 (Minn.1983).

Finally, children affected by termination, especially those who are no longer infants, face the hazard that beneficial alternative care may not be available. It is a mistake to assume the existence of a good alternative. Instead, it must be asked in each case whether reasons for termination are so grave and weighty that the remedy is necessary whether or not agencies succeed in furnishing appropriate alternative care.