In The Matter of The WELFARE OF T.M.D., L.W.D., C.D.D., and M.L.D.

No. C2–84–2115.

Court of Appeals of Minnesota.

Sept. 17, 1985.

William R. Kennedy, Hennepin County Public Defender, Sheila Regan Faulkner, Asst. Public Defender, Minneapolis, for appellant.

Thomas L. Johnson, Hennepin County Atty., Charles H. Salter, Asst. County Atty., Minneapolis, for respondent, Hennepin County Bureau of Social Services.

Patrick Sauter, Minneapolis, for guardian ad litem.

Eileen J. Davis, Minneapolis, for respondent T.M.D.

Heard, considered and decided by WOZNIAK, P.J., and PARKER and LESLIE, JJ.

## OPINION

LESLIE, Judge.

Mother appeals the trial court's determination to terminate parental rights, claiming the evidence does not support the court's ruling. Because we find sufficient evidence to support the court's determination, we affirm.

## FACTS

The appellant-mother is 34 years old, and borderline retarded with an IQ of about 70. She spent most of her childhood as a ward of the state in state institutions because of her mental deficiency. In 1969, she was released from the state hospital at Sauk Center and has since lived on her own.

Appellant has four children—T.D., a girl age 14; L.D., a boy age 12; C.D., a boy age 9; and M.D., another boy who is less than two years old. Each child is illegitimate and all four allegedly have different fathers to whom appellant has never been married.

In February of 1972, when T.D. was less than one year old, the Hennepin County Juvenile Court adjudicated her a dependent child based on appellant's difficulty in caring for her without the assistance and instruction of others. In October of 1977, when C.D. was less than one year old, the Hennepin County Juvenile Court adjudicated him a dependent child based on a series of extremely serious injuries which he received living with his mother and on appellant's admission that she was unable to protect him without help from others. In August of 1979, when L.D. was six years old, the Hennepin County Juvenile Court adjudicated him a dependent child because appellant was unable to provide him with necessary supervision and protection.

In the 1979 proceeding, which adjudicated L.D. a dependent child, the court also found that appellant was unable to provide T.D. and C.D. with necessary supervision and protection. The court determined that while in appellant's care, each of the children had been seriously injured and that appellant had delayed in seeking emergency medical care. The court found appellant was unable to control the children and resorted to inappropriate discipline. The court observed that numerous agencies had offered services to appellant, but she was unable to apply the child care skills to her children. As a result of these proceedings, the court ordered appellant and her children to undergo psychological testing. The court also established goals for appellant, including keeping the house clean, attending parenting classes, obtaining counseling on financial matters, and making and keeping medical appointments for C.D. who was ordered back into her custody on a trial basis.

Shortly after this proceeding, appellant and her children were evaluated by a psychologist who concluded the children had severe problems because of appellant's inability to understand her limitations and the needs of her children. The doctor felt appellant had difficulty providing nurturing, stimulation, and setting appropriate limits for the children because of her severe psychological problems. The doctor testified later that people with appellant's specific psychological problems have difficulty with authority figures, are impulsive, distrustful, lack self-esteem, and may rationalize or project responsibility for problems onto others. The doctor noted that each of the children had or was developing severe behavioral problems because of appellant's insufficient parenting skills. Consequently, he recommended that T.D. and L.D. remain in stable foster homes.

While the psychologist recommended stable foster homes, the children's foster home experience was far from stable, as they were moved from one home to another. From November of 1979 to July of 1980, T.D. and L.D. lived in four different foster homes. Each foster home requested that the children be moved. In late July of 1980, the Hennepin County Juvenile Court ordered the two to be placed in separate foster homes where they have remained.

The problems with the family continued. Appellant made efforts to fulfill the goals set up by the 1979 court order and a similar order in 1981. She saw numerous psychologists and social workers. She enrolled in parenting classes, and she received some help with her financial problems. In spite of her efforts, the psychologists and social workers began to conclude that she was just incapable of changing to become a proper parent.

The children's problems became more intense. They became problem children in school. Psychological evaluations showed that the children were having problems adjusting to their new environment. At least one psychologist concluded that their problems were intensified by appellant's at-

tempts to undermine the foster parents' efforts.

Meanwhile, problems arose with C.D. who had remained in his mother's custody after the 1979 proceedings. In September of 1981, a different psychologist began evaluating him. She concluded that C.D. was a very disturbed and depressed child. As a result of his abnormal focus on sexual themes and his behavior with anatomically correct dolls, the doctor also concluded that C.D. had been sexually abused. Based on allegations of sexual abuse, the Hennepin County Juvenile Court removed C.D. from appellant's home in November of 1981.

Appellant's visitation rights were gradually restricted in scope and in duration because the foster mothers complained that the visits were adversely affecting the children. In 1982, at the request of Hennepin County Bureau of Social Services, the court ordered appellant's visits with T.D. to be supervised and restricted to the foster home. The court also terminated appellant's visitation with C.D. and L.D. In August and again in December of 1982, the court continued its order prohibiting appellant from visiting L.D. and C.D. and allowing only supervised visits with T.D.

Major problems began to develop with T.D. in 1983. In February, her psychologist recommended hospitalization because of inappropriate behavior, including disobedience and sex problems. The court initially denied the request for hospitalization, but ordered appellant to not have contact with T.D. In August, the court ordered T.D. hospitalized, and she eventually spent approximately six months at three different institutions.

In October of 1983, M.D., the youngest child, was born. The Hennepin County Bureau of Social Services almost immediately petitioned the court to grant the county custody of M.D., pending the outcome of the termination of parental rights proceedings. On October 18, when M.D. was two days old, the court denied the petition.

On June 28, 1984, the trial to terminate appellant's parental rights began. Over thirty witnesses were called in the trial which lasted over a month. The county relied heavily on the testimony of psychologists, psychiatrists, and social workers who had worked with appellant or her children. Four psychologists and one psychiatrist testified that T.D., L.D., and C.D. all had serious emotional and behavioral problems. They also testified that appellant had severe psychological problems and that her parenting abilities were inadequate. Even though none of these experts had seen appellant recently, based on the many hours of examinations and the severe nature of her psychological problems, they all recommended termination of her parental rights because they felt she could not change her behavior which stemmed from her psychological problems.

The county also called numerous social workers who had worked with appellant at various times and in various areas. The impressions of these witnesses differed to some degree. Almost all of them felt that she had improved somewhat, but most did not feel she could successfully handle the problem children that T.D., L.D., and C.D. had become. The social worker who coordinated appellant's programs felt that she did not absorb the information being taught at the parenting classes which she attended. He felt that she consistently shifted blame for her failures, and that she had consistently attempted to undermine the efforts of psychologists, social workers, and foster parents. He felt that it would be best if the children did not have contact with their mother because of the severe emotional stress which the visits caused them.

All of the children's foster parents also testified. They generally testified that the children had extreme behavior problems when they first started to care for them. They all seemed to be firm with the children and they felt that this consistent firmness had brought about noticeable improvements. L.D.'s foster mother seemed especially proud of the fact that he had shown strong improvements academically and socially, especially in sports. All of the foster parents seemed to admit that the chil-

dren still had behavioral problems, but felt that they had improved greatly. At least two of the three complained that the children's behavioral problems increased greatly after they had visited their mother.

Appellant relied mainly on the testimony of friends, family, and some social workers who had noted a change in her attitude and behavior. They testified that she had moved to a safer neighborhood, kept a clean house, and made genuine efforts to achieve all of the goals which the juvenile courts had set for her. They testified that she was more knowledgeable about children, and that she did not lose her temper nearly as quickly.

The controversy over M.D., the youngest, was much more intense. The county relied mainly on the psychologists who felt that appellant's mental illnesses were such that she would undoubtedly hurt M.D. as he got older. Appellant, on the other hand, brought numerous witnesses who testified that her behavior with M.D. was proper. A nurse specializing in child growth and development testified that M.D. was a normal, healthy baby. She testified that while appellant may need some help, she loved her child and did an adequate job with him. Another nurse testified that appellant acted properly with her child while playing with him, communicating with him, and feeding him. However, on cross-examination both witnesses admitted that it would become more difficult to raise M.D. as he became older and could walk and talk.

On July 25, 1985, less than half-way into the trial, T.D.'s attorney informed the judge that she no longer wanted to oppose the attempt to terminate her mother's parental rights. An examination of T.D. took place in the judge's chambers, but her mother was not allowed to attend. T.D. seemed to understand what she was doing and seemed to be voluntarily consenting; however, cross-examination of her was very limited.

On November 14, 1984, the juvenile court issued its findings and order. The court chronicled appellant's long history of involvement with the juvenile court system, her inability to consistently follow orders of the court, and her pattern of harassment of foster parents. The court found that T.D., L.D., and C.D. were all special needs children who needed stable environments. The court also found appellant had severe emotional and mental problems which have prevented her from providing a stable home for her children. The court found that the prognosis for change was extremely poor, as she would have to go through a restructuring of her entire personality. The court ultimately found that although appellant genuinely loves her children, she is not capable, nor will she be capable in the foreseeable future, to adequately parent her children so that they will be emotionally healthy. The court concluded that appellant's parental rights should be terminated pursuant to Minn.Stat. § 260.-221(b)(2), (4), (5), and (7) (1984).

The mother appeals the ruling, arguing that the facts do not support the conclusion. T.D., who had consented to termination of rights, now has a new attorney who argues that parental rights should not have been terminated. Therefore, while T.D. is technically a respondent, her position is similar to appellant's. Respondent has filed a motion that T.D.'s entire argument be stricken because the issue was not raised at trial and because the issue was not addressed in appellant's brief.

## ISSUES

1. Was there clear and convincing evidence presented to support termination of appellant's parental rights to all four of her children?

2. Should the termination of parental rights of T.D. be reversed because her consent may have been improperly obtained?

## ANALYSIS

 It is well established that in termination of parental rights proceedings the petitioner has a heavy burden of proving by clear and convincing evidence that there are statutory grounds for termination. *Matter of Welfare of R.M.M. III,* 316

N.W.2d 538, 540 (Minn.1982). Furthermore, there is a presumption that a natural parent is a fit and suitable person to care for his or her child. *In Re Dependency of Klugman,* 256 Minn. 113, 118, 97 N.W.2d 425, 428 (1959). However, where there is clear and convincing evidence of statutory grounds for termination and the prognosis for change of the conditions is poor, termination is proper. *See Matter of Welfare of Clausen,* 289 N.W.2d 153, 155 (Minn.1980). The standard of appellate review is something of a hybrid as on the one hand the findings should be respected unless clearly erroneous, but on the other hand the court will "exercise great caution in termination proceedings, finding such action proper only when the evidence clearly mandates such a result in accordance with statutory grounds." *Matter of Welfare of Kidd,* 261 N.W.2d 833, 835 (Minn.1978).

The trial court terminated appellant's rights under four separate grounds—Minn. Stat. § 260.221(b)(2), (4), (5), and (7). § 260.221(b)(2) allows termination when the parent

> has substantially, continuously, or repeatedly refused or neglected to comply with the duties imposed upon that parent by the parent and child relationship, including but not limited to providing the child with necessary food, clothing, shelter, education, and other care and control necessary for the child's physical, mental or emotional health and development, if the parent is physically and financially able.

§ 260.221(b)(4) allows termination if the parent is

> palpably unfit to be a party to the parent and child relationship because of a consistent pattern of specific conduct before the child or of specific conditions directly relating to the parent and child relationship either of which are determined by the court to be permanently detrimental to the physical or mental health of the child.

§ 260.221(b)(5) allows termination if

> following upon a determination of neglect or dependency, reasonable efforts,

under the direction of the court, have failed to correct the conditions leading to the determination.

Finally, § 260.221(b)(7) allows termination if "the child is neglected and in foster care."

██ From a review of the transcript, it is clear that there was sufficient evidence to support the trial court's ruling on the three older children. There was ample evidence to show that the three children were all special needs children. While appellant argued that her children's problems resulted from the trauma of being removed from their mother, numerous experts testified that the problems were caused by appellant or her inadequate parenting. Furthermore, it was the unanimous opinion of the psychologists and psychiatrist who examined appellant that she had severe mental problems which would not change in the near future. While mental problems alone will not justify termination (*see Matter of Welfare of Kidd,* 261 N.W.2d 833, 835 (Minn.1978)), these experts also testified that appellant's conduct stemming from her mental problems caused severe problems for her children. While appellant's conduct may not be quite as bizarre as the mother's in the *Kidd* case, there is still ample evidence of appellant's harmful behavior stemming from a projected permanent mental condition to justify termination under § 260.221(b)(4). *See id.* at 836.

██ The issue of the youngest child is more difficult to resolve because there is no evidence that he is anything other than a healthy, normal child. Numerous witnesses who had seen appellant and M.D. together testified that their interactions were appropriate and healthy. Thus far, his childhood seems different than that of his older brothers and sister who lived in unsafe homes and were subject to physical and verbal attacks by their mother and outsiders.

The county relied mainly on the testimony of the psychologists who felt appellant's deep mental problems would hurt the child. They felt that appellant's problems had not been cured and that they could not be

cured. Although appellant may not have had problems with the young child yet, everybody (even those who had earlier testified in favor of appellant) seemed to agree that the needs and desires of children increase greatly as they learn to walk and talk and go to school. Therefore, numerous witnesses testified that it would be in the best interests of the young child to be liberated before his mother severely harmed him physically and psychologically. This evidence supports termination under § 260.221(b)(4).

■ This court is well aware that courts should not dwell exclusively on the past in termination proceedings. As the Minnesota Supreme Court said in *Matter of the Welfare of Chosa,* 290 N.W.2d 766, 769 (Minn.1980), "[w]e further require that the evidence relating to termination must address conditions that exist at the time of the hearing." We are also aware that numerous witnesses testified that appellant's present treatment of M.D. is generally appropriate. However, in light of the universal testimony that raising M.D. will become much more difficult as he grows older, and the strong testimony by numerous experts that appellant's deep-seated psychological problems have not changed, we feel that the trial court did not err in ordering parental rights terminated.

■ T.D., who informed the trial court that she would not fight termination of parental rights, now argues that her parental rights should not have been terminated. Her new attorney alleges that T.D.'s consent was obtained as a result of a "deal" made by the county and her attorney. Since this issue was not raised at trial, nor was it raised by notice of review, we need not decide this issue. *See* Minn.R. Civ.App.P. 128.02; *see also Republic National Life Ins. Co. v. Lorraine Realty Corp.,* 279 N.W.2d 349, 355, n. 2 (1979). Even if we were to hear this issue, we would be compelled to dismiss it because it is clear that the trial court did not base its ruling on T.D.'s consent.

This court takes no pleasure in terminating appellant's parental rights because the evidence shows that she genuinely loves her children and that she has made efforts to improve herself. However, the evidence also clearly shows she has severe problems which have devastated her children and will almost certainly continue. This case reminds us of *Matter of Welfare of R.M.M. III,* 316 N.W.2d 538, 542 (Minn.1982), where the court said

[o]ur decision is not an indictment of [the mother]. Rather it is a recognition that this woman, who has herself been victimized so many ways and for so long, is simply unable to care for her child even though she loves him. Her inability to do so threatens the mental and physical health of her son.

### DECISION

Because there was ample evidence of appellant's long history of extreme psychological and behavioral problems and strong expert testimony that her improper behavior would continue in the future, we affirm.